846 A.2d 1127

John A. CANNON

v.

Wendy J. CANNON.

No. 295, Sept. Term, 2003.

Court of Special Appeals of Maryland.

April 15, 2004.

James S. Maxwell (Brian M. Barke, Maxwell & Co., LLC on the brief), Rockville, for appellant.

Lucien T. Winegar of Frederick, for appellee.

Argued before DAVIS, DEBORAH S. EYLER, and BARBERA, JJ.

DAVIS, Judge.

On July 3, 2002, appellee Wendy J. Cannon filed a Complaint for Absolute Divorce in the Circuit Court for Frederick County. After filing an Answer to the Complaint on July 22, 2002, appellant John A. Cannon requested a hearing to determine the validity of a Pre–Nuptial Agreement executed by the parties prior to their marriage. At the hearing, appellant filed a notice of appeal prematurely on

April 25, 2003. On September 15, 2003, the court issued an order directing appellant to pay alimony *pendente lite*. Appellant noted an appeal from that order on October 2, 2003.[1]

■ Appellant presents three questions[2] for our review, which we consolidate and rephrase as follows:

Did the trial court err in its determination that the Pre–Nuptial Agreement executed by the parties was not valid or enforceable?

We answer appellant's question in the affirmative and, accordingly, reverse the judgment of the circuit court.

## FACTUAL BACKGROUND

Appellant and appellee were married on June 25, 1994; there were no children born of the marriage. The parties

---

1. Generally, an appeal will properly lie only from a "final judgment." *See* Md.Code (2002 Repl.Vol.), Cts. & Jud. Proc. (C.J.) § 12–301. In the instant case, a final judgment has not been entered. However, C.J. 12–303(v) does permit certain interlocutory orders "[f]or the . . . payment of money," which can include orders for *pendente lite* support. *See Frey v. Frey*, 298 Md. 552, 556, 471 A.2d 705 (1984). In *Frey*, the Court of Appeals determined that, under the facts of the case, an "order to pay money could not have been made without the order voiding the antenuptial agreement." We believe, and the parties agree, that the holding of *Frey* is applicable to the instant facts. Thus, despite the fact that the circuit court's order finding that the Pre–Nuptial Agreement was unenforceable was neither a final judgment nor an interlocutory order specifically set forth in C.J. § 12–303, we conclude that the issue is properly before us pursuant to the valid appeal taken on the *pendente lite* order entered on September 15, 2003.

2. The second issue posed by appellant is whether, assuming it was permissible to consider the "side oral agreement" of the parties intended to frustrate bankruptcy creditors of appellee and her former husband, the parol agreement is unenforceable as a fraud upon creditors and against public policy. The third issue raised by appellant was whether appellee is estopped or has waived any right to enforce the parol Agreement for failure to assert her rights under that Agreement for six and one-half years commencing in February 1996, when appellant made clear that he intended for the Agreement to remain in full force and effect. Because we decide this appeal based on the first issue raised and because the parties failed to present either the second or third issue to the lower court, we decline to address them. Md. Rule 8–131.

separated on May 3, 2001. Prior to the marriage between the parties, appellee had been previously married on April 10, 1976. Two children were born of that union, which ended in a divorce on October 4, 1990. As part of the divorce decree, a Separation Agreement, which was incorporated but not merged into the decree, provided that appellee would have custody of the two minor children and would receive child support payments from her former husband in the amount of $300 per month.

Appellant and appellee met in 1977 and maintained a friendship for several years. Their relationship became more intimate in December 1986, at a time when appellee was still married to her former husband. In July 1990, appellant and appellee commenced cohabiting with each other. Appellee and her children, then eight and twelve years old, moved into appellant's townhouse. In the latter part of 1992, the parties became engaged to marry and agreed to set the marriage date for some time in 1994. In 1993, appellant, appellee, and her children moved into a single-family home located on Samuels Road in New Market, Frederick County (Samuels Road Home). The house was purchased by appellant with proceeds from the sale of his townhouse and titled solely in appellant's name.

In 1994, appellant was employed by GE Global Exchange Services and had earned approximately $40,000 per year in the previous two years. Appellee was employed by Images Hair Design, Inc., where she had worked since 1986, as an assistant secretary earning a yearly income between $15,000 and $19,000. In April 1994, appellant approached appellee about the possibility of executing a pre-nuptial agreement because of his concern about the bankruptcy proceedings commenced against appellee and her former husband. Specifically, appellant stated that creditors in the bankruptcy proceeding would attempt to go after his assets once he and appellee were married.

On May 27, 1994, approximately one month before their wedding, appellant and appellee executed a Pre–Nuptial

Agreement (Agreement). Pursuant to the Agreement, the parties agreed that each party would retain sole title to any property acquired prior to and during the marriage and any debts incurred prior to and during the marriage would remain the debt of the party who had incurred the debt. Additionally, the parties made a series of acknowledgements[3] and

---

**3.** The Agreement provided in pertinent part:

RECITALS

The parties stipulate and recite that:

. . .

C. Each of the parties has made a full and complete disclosure to the other party of all of his or her own property and assets and of the value thereof, to the best of the disclosing party's knowledge. This agreement is entered into with a full knowledge on the part of each as to the extent and probable value of the estate of the other, and of all the rights conferred by law on each in the estate of the other by virtue of said proposed marriage.

D. Each of the parties has made a full and complete disclosure to the other party of all of his or her income, expenses, and debts, to the best of the disclosing party's knowledge. This agreement is entered into with a full knowledge on the part of each as to the income, expenses, and debts of the other, and of all the rights conferred by law on each to alimony, support and maintenance by virtue of said proposed marriage.

. . .

SECTION ONE

FULL KNOWLEDGE OF BOTH PARTIES

This Agreement is entered into by the parties hereto with full knowledge on the part of each of the income, expenses, and debts of the other, and of the extent and probable value of all of the property or estate of the other, and of all rights that, but for this Agreement, would be conferred by law upon each of them, in the income, property or estate of the other, by virtue of the consummation of the said proposed marriage; and the rights of the respective parties hereto in and to each other's estate and property, of whatsoever character the same may be, shall be determined, fixed and settled by this Agreement, and not otherwise.

SECTION FOURTEEN

INDEPENDENT COUNSEL

The parties acknowledge that each has been free to seek the advice of independent counsel of his or her own choosing in negotiation and execution of this Agreement, and that the provisions of this Agreement constitute a reasonable and adequate settlement of their respective alimony, support, property rights, and personal rights. The parties further agree that each will be responsible for his or her own legal fees incurred in the preparation and negotiation of this Agreement.

thereafter waived certain rights, including those relating to alimony payments, a monetary award, and retirement benefits.

The parties were married on June 25, 1994. By late 1998, their relationship had started to deteriorate. As noted, they separated in 2001. Appellee and her children moved out of the Samuels Road house. On July 3, 2002, appellee filed a Complaint for Absolute Divorce,[4] which alleged, *inter alia,* that the Agreement was no longer valid and, as a result, she was entitled to her share in the marital estate and monetary support from appellant. Subsequent to his timely answer, appellant requested a hearing on the validity of the Agreement. On March 26, 2003, a hearing was conducted after which the trial court rendered its oral opinion, in which it made its factual findings regarding the validity of the Agreement. It began with an analysis of evidence pertaining to the existence of a confidential relationship:

> And I'll start with confidentiality of the relationship, and I will tell you right away it doesn't cause me to focus on the burden of proof. These parties lived together for a period of time. About, about four years. They moved in together in 1990. I don't [sic] whether it was the beginning or the later part of the year. But they got married in the middle of '94. June 25th. So they lived together and that in itself doesn't establish a confidential relationship but it seems to me that it's clear that even before the marriage and before this agreement came on the scene, [appellee] was giving $500 to $800—that's not contested—to [appellant] every month and he was paying the bills. The intent then became that under this agreement she would give him a thousand [dollars] a month. He would pay all of the bills. I think the agreement provides, specifies what he's going to pay al-

---

4. In paragraph 8 of the complaint, appellee alleges:

 Prior to the marriage, the parties executed a document entitled "Pre-Nuptial Agreement" and dated May 27, 1994. [Appellee] believes and so avers that such document is of no force and effect because it was executed by [appellee] without benefit of counsel, was fraudulently induced, is patently unconscionable, and was not properly executed.

though he testified that he paid, ah, I believe it was something toward her car and some other items. So to that extent I believe that [appellee] accepted the guidance, I'll put it, of [appellant] in terms of surrendering to him some of her financial independence, if not all of it, and relying on him to make financial decisions and, and take care of the two of them, and that continued into the marriage. That doesn't matter because it was after the agreement was signed, but I think that supports, a piece of evidence that supports the conclusion that that's what was going on before the marriage. *So there was an element of confidentiality.* She trusted. He managed the funds. Interestingly enough, her testimony was, and I think not contradicted, she made between 15 to 18 or $19,000 a year, a, a month. I'm sorry. Fifteen to 18 or $19,000 a year. Now that ends up somewhere in the neighborhood of $1,500 a month or less. Yet she was gonna [sic] pay him a thousand [dollars] a month toward these household expenses. Now I, I understand that while the children were minors she was to receive $300 per child per month so she had more than just her salary at least during part of this time. But at some point they pass that age. She didn't get child support. Going back to the day of the signing, however, from her salary she was paying him about two-thirds under this agreement. Going to pay him about two-thirds of her income, gross income, for him to pay the bills and take care of things. She accepted that he was going to own the house that he purchased. *That doesn't establish confidentiality, but it seems to me that that at least suggests some reliance on [appellant].*

Addressing the intended purpose of the Agreement, the court opined:

What persuades me to conc, [sic] to reach the final answer in this case is this. It is absolutely certain as far as I'm concerned both from the testimony of [appellee], from the answer to interrogatory of [appellant] and from his own testimony, that they talked about this, the purpose of this agreement, the impetus—let me say that. The impetus for this agreement was concern, . . ., but it led [appellant] to be

very concerned that he might somehow have to defend himself or his assets from some claim of creditor of [appellee] and he wanted to avoid that. So he asked that she enter this agreement. And Ms Cannon said by all means. She didn't want him to be in that position and she was willing to enter that agreement. She said something about it being, her bankruptcy being cleared up in February of '96. I don't know. But here's what strikes me and what causes me to reach the conclusion. When asked on cross[-]examination, [appellant] again confirmed—I shouldn't say again—[appellant] confirmed that the primary purpose of the contract was to prevent him from any claims of her creditors coming out of the bankruptcy. He said he didn't know when the bankruptcy was filed. He didn't know when that threat would end. But because of the various disputes they had, he didn't see any reason to go along with any termination to that agreement. I believe that it was understood that the agreement was to be in place for that protection. Once that protection went, it was not to be in effect, and I think that is a finding that's consistent with the law that I recited at the beginning of, of my remarks.

*The fact that there was a confidential relationship I don't believe in itself is dispositive.* But I believe that it, I should take that into account with the fact that there was a confidential relationship to the extent that [appellee] was justified or I'd say should, ah, maybe it's not justified is the right word. *But [appellee] understandably believed that the purpose was to get through this bankruptcy issue and then the matter would be at an end.* I think she believed that in May of 1994. She trusted [appellant] as I commented before and so she signed what then would seem to be a, what then was I believe an agreement that was not fair and equitable.

Regarding whether there was disclosure or actual knowledge of appellant's property and resources, the court found:

What really counts, I think, is did the parties know what they were doing, and it's not just a matter of saying well, gee, if you were slightly mislead [sic] or slightly misunder-

stood I should say, it's over. The point is we treat these people as adults. They were free to enter into, enter into [sic] a contract. And the contract is otherwise enforceable. It shouldn't be undone I don't believe because it slightly favors one side or the other this much later.

. . .

What's really key is do the parties know what they were doing and if someone is ignorant, he or she just can't say well, I don't have any clue but I'll sign this and then later blow the whole thing apart. So it's not just simply a matter of, I think, of knowing what's being done. One has an obligation at least to make some reasonable inquiries.

. . .

There's a question of frank, full, and truthful disclosure. [Appellant] has testified that he filled out a form stating his assets when he was applying to qualify for a loan for the new house. I frankly don't recall him ever saying I showed this to [appellee], but I do recall he said there was some discussion of the matter, and I accept that she had some knowledge at least that he had the ability to own a house and a car and have a full time job and know some money, but make some pretty good money by working Sunday nights, Sunday mornings from midnight to eight and getting double overtime. So there was some disclosure, and, and perhaps if that were the only element in question it wouldn't make much difference.

The court made a factual and a credibility determination with respect to appellee's knowledge of the meaning and effect of the Agreement and her opportunity to acquire an understanding of the legal ramifications of the Agreement:

The issue of voluntary, free, full knowledge of, of [sic] the meaning and effect of the agreement, well, again I want to be careful. One can't just remain ignorant, hide their eyes, and say well, gee, I didn't know what this was all about so it's got to be undone. One has some obligation to exercise

some independent learning as to what's going on. I don't think that anything prevented [appellee] from having an understanding.

. . .

[Appellee] testified in her direct examination, . . . that [appellant] brought this agreement home on the 27th of May, told her what it was for, she read it over briefly, leafed through it, he pointed a few things out, and she signed it that day. On rebuttal [appellee] said well, he brought it home. He didn't really bother her every day about it. He asked a couple of times. I want to be very clear. The benefit of telling the truth is you don't have to remember what you said. I, I [sic] think [appellee's] not being candid with the [c]ourt and I'm being real blunt.

Addressing appellee's failure to seek independent legal advice, the following observations were made in conjunction with the issue of whether there was knowledge of the effect of the Agreement:

One of the elements, another element is the importance of independent legal advice. The testimony is that [appellee] didn't seek independent legal advice. She candidly testified that she wasn't discouraged from doing that. She says she wasn't encouraged, but she wasn't discouraged either from seeking independent legal advice, and as I said a moment ago, one can't just say well, gee, I chose to remain ignorant and rely on that. So I think as [appellant's counsel] argues that it doesn't establish in itself anything.

Speaking to the fairness of the Agreement, the court said: The fair and equitable nature of the agreement and I'm going, want to be as clear as I can, and I'm trying to look at this from the 24th of, or 27th of May of 1994 when [appellee] signed this agreement and when it became a binding agreement by [appellant's] signature she had waived her right to alimony, any, any death benefits that might come her way including her spousal rights other than what might come in her will executed later after this agreement, any claim of

retirement benefits, a waiver of a monetary award, and she could be told to leave, put out of the house on [sixty-]days['] notice. That probably was as gently written a provision as it could be given it's one day one could wake up and be told you're out of here. I'll be back in in [sixty] days. So I find that, that frankly even at the time of the signing this was a pretty draconian set of terms. So that, those are the, that's the way I look at this agreement.

Now, you know, it wouldn't be so bad to give up your right to claim either alimony or death benefits or any of those things for a period of time, a short period of time. So it makes sense to say in May of 1994, yeah, I have to get through this bankruptcy for the next two or three years. The marriage is just starting. I'll give up those rights. But when looked at over the context of what it means from May of 1994 for what might be a lifetime, whatever that might be, it, it certainly is pretty draconian and I think that the, given the nature of the relationship of these parties, and given the purpose of the agreement, they at least—not the purpose, the initial impetus for this agreement, *[appellee] could rightfully understand that this was going to go into effect until we got through that period. They got through that period.* I think there is some justification therefore for her not spending as much time dwelling on it, and I accept the fact that she, under those circumstances, made, knew as much as she needed to know. *If they had gotten, if they had separated and there was a divorce coming up in 1995, I think she'd be bound by this. Probably in 1996. But after that period of time they had both anticipated this agreement would be at an end.*

So I've done my best to (indiscernible) fully my reasons. Whether anyone agrees with me or not, that's why I decide that this, in this case, this prenuptial agreement should be set aside.

(Emphasis added.)

The trial court then ruled that, for the reasons stated, the Agreement "should be set aside." The court issued a written order to that effect on May 5, 2003. As explained above, after

appellant was ordered to pay *pendente lite* alimony, he noted this appeal. Additional facts will be supplied as warranted.

## LEGAL ANALYSIS

Appellant contends that the court's ruling was an act of contract interpretation, and that the court incorrectly used extrinsic evidence to interpret the Agreement as having terminated when appellee's assets were no longer subject to levy by her bankruptcy creditors. He asserts that the Agreement is unambiguous and did not have a termination date and, therefore, the court's ruling was legally incorrect. More specifically, he claims that,

> [u]nder Maryland's Law of Objective Interpretation of Contracts, the Unambiguous Language of an Agreement, Such as the Parties['] May 27, 1994 Pre–Nuptial Agreement, Will Not Give Way to What a Party Thought the Agreement Meant or Was Intended to Mean, and in the Absence of Ambiguity the Court is Limited to the Four Corners of the Contract While Disregarding Parol and Other Extrinsic Evidence.

Appellee, for her part, readily concedes that the Agreement is unambiguous in its terms and, therefore, no additional evidence is needed to interpret it. Appellee contends, however, that the lower court correctly considered parol or extrinsic evidence "not for the purpose of interpreting the Agreement, but rather to test [appellee's] claim that that Agreement was fraudulently induced." In support of her position, appellee cites *Trupp v. Wolff,* 24 Md.App. 588, 335 A.2d 171 (1975). We think it helpful, in framing the issue, to set forth the passage from *Trupp,* upon which appellee relies:

> "No rule is more firmly established or more generally recognized than that which excludes parol evidence offered to vary, contradict, add to or take from a written instrument. But in our opinion that rule, in cases where the execution of a written instrument has been induced by false or fraudulent statements or promises, does not prevent the introduction of evidence showing such facts in any action on

the instrument, because such evidence is not offered to vary or to contradict the instrument but to destroy it, and cases dealing with evidence which, while conceding the validity of such an instrument, nevertheless is offered to contradict or vary it, are parallel to the question."

*Id.* at 604, 335 A.2d 171 (citing *Councill v. Sun Ins. Office,* 146 Md. 137, 149, 126 A. 229 (1924)); *accord Schmidt v. Millhauser,* 212 Md. 585, 594, 130 A.2d 572 (1957).

*Trupp* goes on to explain that "the gist of the fraud in such cases is not the failure to perform the agreement, but the fraudulent intent of the promisor, the false representation of an existing intention to perform where such intent is in fact non-existent and the deception of the promisee by such false promise." *Id.* Appellee, alternatively, asks that, if we should reject her theory that she was wrongfully induced to enter into the Agreement, we decide whether the Agreement, as written, is valid.

We shall begin our analysis by addressing appellant's claim that the Agreement is unambiguous, that the lower court was limited to the four corners of the Agreement, and that the court was required to disregard parol and other extrinsic evidence. We shall then consider whether the trial judge's findings of fact concerning the validity of the Agreement were clearly erroneous and, therefore, did not support the conclusion that the Agreement was invalid. Finally, we shall consider appellee's claim of fraud in the inducement based on appellant's alleged representation that the Agreement would end when he was no longer subjected to the claims of her creditors.

## STANDARD OF REVIEW

It is within the "exclusive prerogative" of the trial judge, when making findings of fact, to " 'judge the credibility of the witnesses' " and weigh the evidence. *Shallow Run Ltd. Partnership v. State Highway Admin.,* 113 Md.App. 156, 173, 686 A.2d 1113 (1996)(quoting *Nixon v. State,* 96 Md.App. 485, 491–92, 625 A.2d 404 (1993)). Maryland Rule 8–131(c) man-

dates that we review a trial court's factual findings under the "clearly erroneous" standard, which means that, " 'if there is any competent, material evidence to support the factual findings below, we cannot hold those findings to be clearly erroneous.' " *Id.* at 174, 686 A.2d 1113 (quoting *Staley v. Staley,* 25 Md.App. 99, 110, 335 A.2d 114 (1975)). However, for conclusions of law, we afford no deference to the trial judge. *Himelstein v. Arrow Cab,* 113 Md.App. 530, 536, 688 A.2d 491 (1997). Thus, we may exercise our independent judgment to determine whether the legal conclusions reached by the trial judge are "legally correct." *Id.*

### Objective Interpretation of Contracts

 Citing *Langston v. Langston,* 366 Md. 490, 784 A.2d 1086 (2001), appellant principally relies on the objective law of contract interpretation. He contends that, "because the parties' May 27, 1994 pre-nuptial agreement has no provision reflecting the side agreement asserted by appellee, one should not be read into the agreement as a matter of interpretation. Accordingly, the agreement did not expire, and is presently enforceable." A pre-nuptial agreement is measured against the same rules of interpretation as other contracts. As the Court of Appeals explained in *Herget v. Herget,* 319 Md. 466, 470, 573 A.2d 798 (1990):

> An antenuptial agreement is a contract, subject to the general rules of contract interpretation. It is well settled that Maryland follows the objective law of contracts. We explained, in *Aetna Cas. & Sur. v. Ins. Comm'r,* 293 Md. 409, 420, 445 A.2d 14 (1982), the procedure to be followed in interpreting a contract:
>
>> In Maryland, under the objective law of contracts, a court, in construing an agreement, must first determine from the language of the agreement itself, what a reasonable person in the position of the parties would have meant at the time it was effectuated. Where the language of the contract is unambiguous, its plain meaning will be given effect. There is no need for further construction. (Citations omitted).

In the particular context of the case before us, our task is perhaps most aptly stated by the language of Judge Boyd in *Joffe & Mankowitz v. Niagara Ins. Co.*, 116 Md. 155, 160, 81 A. 281 (1911):

Courts have no right to make new contracts for the parties, or ignore those already made by them simply to avoid seeming hardships.

(Other citations omitted.) *See generally also Young v. Anne Arundel County*, 146 Md.App. 526, 586, 807 A.2d 651 (2002).

 He correctly contends that extrinsic evidence of an oral agreement cannot be considered when a contract, read as a whole, is determined by a fact finder to be unambiguous. His premise, however, does not preclude a determination, as appellee claims, that the Agreement was not fairly and equitably procured and, as a result, was invalid from its inception. *See id.* at 587, 807 A.2d 651; *PaineWebber Inc. v. East*, 363 Md. 408, 414, 768 A.2d 1029 (2001). The lower court's opinion did not interpret the terms of the Agreement, nor do the parties disagree as to the legal import of any of its provisions. Moreover, as noted, the parties agree, and the court so held, that the language of the Agreement is unambiguous. The lower court appeared to apply the objective law of contracts only insofar as the provisions and their undisputed legal effect measure up to *Frey v. Frey, supra*, and its progeny. The court, however, did not squarely address appellant's claim that the parol agreement grafted onto the Agreement a termination provision that the court believed reflected the parties' true intentions.

The lower court found that appellee "understandably believed that the purpose was to get through this bankruptcy issue and then the matter would be at an end.... [Appellee] could rightfully understand that this was going to go into effect until we got through that period." At the outset, the court's finding focused on appellee's subjective belief that the Agreement would terminate sometime in early 1996. When asked when appellee expected the Agreement to expire, she responded that she expected it to expire in February 1996

"based upon, at that time the bankruptcy would be off of my credit, and I would have, you know, [sic] credit back." Appellant acknowledged that the reason he sought a pre-nuptial agreement was because of appellee's bankruptcy, but insisted he had had no idea when her bankruptcy would end and responded, "absolutely not," when asked whether he had told appellee that the Agreement would be terminated "when that period of time was over."

The trial judge concluded that appellee had a "belief" that the Agreement would expire. There was no testimony, however, from which the lower court could find that appellant made a promise that the Agreement would expire at some point in the future. Appellee's subjective belief that the Agreement would expire without evidence that there had been a promise, in the first instance, is insufficient to establish the parol agreement. The court erred in its conclusion that appellee had a right to expect appellant to rescind the Agreement in the absence of such a promise.

■ Moreover, the Agreement was executed in contemplation of a divorce between the parties. In other words, absent an express provision to the contrary, it is the nature of the Agreement which makes the termination implicitly the dissolution of the marital relationship. The potential of such dissolution or death is *le raison d'etre* for the Agreement. (*See Moore v. Jacobsen*, 373 Md. 185, 194–95, 817 A.2d 212 (2003)), where Court of Appeals held that, because alimony is an obligation incidental to the duty to provide maintenance to a former spouse, growing out of the marriage relationship, where a non-modifiable separation agreement fails to provide otherwise, alimony terminates upon remarriage. Likewise, the subject Agreement implicitly and explicitly contemplates performance upon the conditions of death or dissolution of the marriage. Virtually every provision of the Agreement references its contemplated duration, i.e., "during the marriage."

Furthermore, Section Seventeen provides that it may not be changed in any manner except by written instrument duly executed and acknowledged by both parties. As such, the

purported parol agreement, in this case, engrafts onto the Agreement a term not consistent with the implicit and explicit terms as to the duration of the instrument. The trial judge never squarely addressed appellant's contention that, as a matter of contract interpretation, the Agreement did not terminate because the expiration term in the "oral side agreement" should not be read into the written Agreement. The court, we think, erred in its view of what appellee understood or believed as one of the factors in its determination of the validity of the Agreement, *viz.*, it factored in her understanding as indicative of the unfairness of the Agreement. In conflating what appellee "understandably believed" was the purpose of the Agreement with a *Frey/Hartz* determination of fairness, it accorded weight that was not due the latter.

### *Validity of Agreement*

Turning to the validity of the Agreement, in *Frey*, the Court of Appeals, for the first time, held that under Maryland law a pre-nuptial agreement executed in contemplation of divorce was not void as being against public policy. *See Frey*, 298 Md. at 563, 471 A.2d 705. The Court then adopted a five-factor test from *Hartz v. Hartz*, 248 Md. 47, 234 A.2d 865 (1967), to evaluate whether a pre-nuptial agreement is valid:

The agreement must be fair and equitable in procurement and result. The parties must make frank, full and truthful disclosure of all their assets. The agreement must be "entered into voluntarily, freely and with full knowledge of its meaning and effect." Further, [the Court] ... emphasized the importance of independent legal advice in evaluating whether the agreement was voluntarily and understandingly made. Also, in evaluating the disclosure and procurement of the agreement, the trial judge must remember that the parties stand in a confidential relationship.

*Frey*, 298 Md. at 563, 471 A.2d 705 (citing *Hartz*, 248 Md. at 57, 234 A.2d 865).

The Court of Appeals summarized thusly:

"The real test in a determination of the validity of a [pre-]nuptial agreement is whether there was overreaching, that is, whether in the atmosphere and environment of the confidential relationship there was unfairness or inequity in the result of the agreement or in its procurement. Frank, full and truthful disclosure of what is being relinquished (or in lieu thereof actual knowledge otherwise available or obtained) is the key that turns the lock of the door leading to impregnable validity."

*Id.* at 564, 234 A.2d 865 (quoting *Hartz*, 248 Md. at 57, 234 A.2d 865).

In *Harbom v. Harbom*, 134 Md.App. 430, 441–42, 760 A.2d 272 (2000), we discussed the nature of the relationship between parties negotiating an antenuptial agreement and the burden of proof when the validity of such an agreement is challenged:

*Levy* [*v. Sherman*, 185 Md. 63, 43 A.2d 25 (1945),] and *Ortel* [*v. Gettig*, 207 Md. 594, 116 A.2d 145 (1955),] establish the law of Maryland to be that there is a confidential relationship between a man and a woman who are about to enter into an antenuptial agreement whether or not they are then engaged and whether or not the marriage is to be one of convenience; that this confidential relationship calls for frank, full and truthful disclosure of the worth of the property, real and personal, as to which there is a waiver of rights in whole or in part, so that he or she who waives can know what it is he or she is waiving. If there is adequate knowledge of what that frank, full and truthful disclosure would reveal, this may serve as a substitute though there has been no such disclosure. If there is neither proper disclosure nor actual knowledge and the allowance made to the one who waives is unfairly disproportionate to the worth of the property involved at the time the agreement is made, *the burden is cast upon the one who relies on the agreement* to prove that it was entered into voluntarily, freely and with full knowledge of its meaning and effect. The reviewing court is much more apt to find there was voluntary and

understanding execution if the one who later asserts invalidity had independent legal advice as to the execution. . . . *Id.* at 441–42, 760 A.2d 272 (citing *Hartz,* 248 Md. at 56–57, 234 A.2d 865).

To recapitulate, the parties may insulate an agreement from a subsequent challenge on the basis of overreaching simply by making antecedent full, frank, and truthful disclosure. Such disclosure renders the agreement " 'impregnable.' " *Harbom,* 134 Md.App. at 444, 760 A.2d 272. Proof that the disgruntled party had a " 'general idea' " of the spouse's property and resources will suffice as an alternative to full disclosure. If there is frank, full, and truthful disclosure or actual knowledge and the allowance to the one who waives is proportionate to the property involved, the inquiry, for all intents and purposes, is concluded. Only when proper disclosure has not been made and the allowance is disproportionate must a proponent of the agreement shoulder the burden of proving that it was entered into voluntarily, freely, and with full knowledge of its meaning and effect. Independent legal advice provided to a party claiming invalidity supports a finding of validity. Under extraordinary and rare circumstances an agreement may always be set aside on the basis that it is unconscionable.

With these principles in mind, we review the lower court's findings with respect to the factors establishing validity of the Agreement.

### *Full, Frank, and Truthful Disclosure of Assets*

The trial judge found that, even in the absence of any financial statements exchanged between the parties before the execution of the Agreement, there was information available to the parties that would disclose the value of each spouse's property and resources. Prior to the marriage, appellant and appellee lived together for approximately four years. Appellee had, if not actual knowledge, at least a " 'general idea' " of appellant's job, his hourly wage, his double-overtime pay for working night hours on Sundays, the type of car he owned, and the fact that, in 1993, he was financially able to purchase

the house on Samuels Road. *See Harbom,* 134 Md.App. at 444, 760 A.2d 272 (holding that "[t]he alternative to full disclosure is proof that the disgruntled party had a 'general idea' of the spouse's property and resources."). In recounting the testimony, the court found that appellant and appellee had some discussion about "a form stating [appellant's] assets when he was applying to qualify for a loan for the new house" and the design and the financial impact of designs on the overall price of the home. Moreover, appellant was aware that appellee had filed for bankruptcy during her previous marriage and that her only assets were a used vehicle and some home furnishings. Considering the amount of time the parties lived together, it is reasonable to infer, as the trial judge did, that there was at least a " 'general knowledge' " possessed by both parties of each other's income and assets. In sum, the court credited evidence that

> [appellee] had some knowledge at least that he had the ability to own a house and a car and have a full time job and know [sic] some money, but make some pretty good money by working Sunday nights, Sunday mornings from midnight to eight and getting double overtime. So there was some disclosure, and, perhaps if that were the only element in question it wouldn't make much difference.

The trial judge's findings in this regard were not clearly erroneous.

### Full Knowledge of the Effect of the Agreement

 With respect to the trial judge's finding that appellee entered into the Agreement "with full knowledge of its effect," although appellee claimed to have had only one day to review and sign the Agreement, there was evidence to support the trial judge's finding that she had the draft Agreement for several days prior to her signing it. Mary Ann Elizabeth Cooling testified that she notarized appellee's signature on a document captioned "Pre–Nuptial Agreement" on May 27, 1994; however, appellant did not execute the Agreement until June 2, 1994—six days later. The court, in addressing the opportunity of the parties to seek knowledge of the effect of

the Agreement, discredited appellee's claim that she had only one day to review the document, but focused more on the intended purpose that the parties had in executing the Agreement, stating that appellee had said she signed the Agreement upon presentment by appellant, but, in fact, they had talked about the Agreement and the impetus was to protect appellant's assets from the claims of appellee's creditors.

The lower court more directly addressed the knowledge of the effect of the Agreement in finding that, because appellee believed she was relinquishing her rights for a short period of time, she felt that she "knew as much as she needed to know." Ultimately, however, the lower court opined, "I don't think anything prevented [appellee] from having an understanding." Reviewing the entirety of the court's factual findings on this issue, the court concluded that appellee knew the legal effect of the Agreement. These findings are not clearly erroneous.

### Independent Legal Advice

 That appellee never sought the services of an attorney to review the Agreement is not in dispute. The court, in noting that appellee did not seek independent legal advice, observed that she "candidly testified that she wasn't discouraged from doing that. She says she wasn't encouraged, but she wasn't discouraged either from seeking independent legal advice," and "one can't just say well, gee, I choose to remain ignorant and rely on that." The court accordingly adopted the position of counsel for appellant, "It (the failure to employ counsel) doesn't in itself establish anything." Patently, no one coerced or threatened appellee to sign the Agreement. It was appellee's decision not to seek the legal expertise of an attorney, without any overreaching on the part of appellant.

At the time she executed the Agreement, appellee was a thirty-seven-year-old high school graduate who had been a party, represented by counsel, in prior divorce and bankruptcy proceedings. The court's findings that appellee had ample time, without any coercion on the part of appellant, to seek legal advice and that appellee had knowledge of the impor-

tance of independent legal advice was, we think, supported by the evidence.

### Confidential Relationship

 Appellee relies on the lower court's determination that a confidential relationship existed between the parties. A confidential relationship " 'exists where one party is under the domination of another, or where, under the circumstances, such party is justified in assuming that the other will not act in a manner inconsistent with his or her welfare.' " *McCoy v. Clark*, 21 Md.App. 198, 204, 319 A.2d 314 (1974)(quoting *Bass v. Smith*, 189 Md. 461, 469, 56 A.2d 800 (1948)).

Appellant's trial counsel said, in his opening statement to the court, "since we passed the Equal Rights Amendment, there is authority that the presumption that the husband is the dominant party in a relationship between a man and a woman, [the] Equal Rights Amendment disposed of that ..." and, hence there could be no presumption of a confidential relationship or a shift of the burden of proof as a result thereof. After appellee's counsel took a contrary position, the trial judge responded that it would "take a look" and change his position if constrained to do so based on his research. After the recess, citing *Martin v. Farber*, 68 Md.App. 137, 510 A.2d 608 (1968) at 146, the court concluded that a confidential relationship "had to be established factually." We agree with that conclusion and explain.

 In *Harbom*, 134 Md.App. at 442, 760 A.2d 272, we iterated that the existence of overreaching on the part of the dominant party in a confidential relationship must be determined in the atmosphere and environment of a confidential relationship. We noted, in *Bell v. Bell*, 38 Md.App. 10, 379 A.2d 419 (1977) (citing *Owings v. Currier*, 186 Md. 590, 47 A.2d 743 (1946)), and *Manos v. Papachrist*, 199 Md. 257, 86 A.2d 474 (1952), that, even though ordinarily the relationship between husband and wife is a confidential one, Maryland did not presume the existence of a confidential relationship in transactions between husband and wife in 1951, and recognized a presumption that the husband was the dominant figure

in the marriage. *Manos,* 199 Md. at 262, 86 A.2d 474. Because of this "natural dominance of the husband over the wife," "utmost care" was to be taken in investigating a gift that results in an inequitable transfer. *Id.* In *Bell,* we said: "We noted the questionable foundation upon which this presumption rests in light of Article 46 of the Maryland Declaration of Rights,[5] better known as the Equal Rights Amendment. . . ." *Bell,* 38 Md.App. at 13–14, 379 A.2d 419. We held that "[w]hen the presumption is disregarded the question of whether a confidential relationship exists between husband and wife becomes a question of fact. Among the various factors to be considered are the age, mental condition, education, business experience, state of health, and degree of dependence of the spouse in question." *Id.* at 14, 379 A.2d 419.

In 1988, Judge Weant, writing for this Court in *Hale v. Hale,* 74 Md.App. 555, 564–68, 539 A.2d 247 (1988), an appeal by a husband whose wife had brought an action against him seeking rescission of a separation agreement in upholding the trial judge's finding that the husband was the dominant party, adopted the holding in *Bell* that the existence of a confidential relationship between husband and wife is a question of fact. More recently, in 1996, Judge Cathell, writing for this Court in *Tedesco v. Tedesco,* 111 Md.App. 648, 667, 683 A.2d 1133 (1996), referenced the exhaustive explication in *Burning Tree Club v. Bainum,* 305 Md. 53, 63–71, 501 A.2d 817 (1985), of how courts in Maryland and other states have implemented the Equal Rights Amendment. The Court concluded:

When the voters of Maryland ratified what is now Article 46 of the Declaration of Rights . . . *[t]he presumption of dominance in a marriage by a husband was erased,* and the right of the husband to claim alimony was born. . . . Accordingly, in our assessment of the issues presented, the existence of a confidential relationship and the imposition of a

---

**5.** Article 46 of the Maryland Declaration of Rights, ratified November 7, 1972 and November 7, 1978, provides, "Equality of rights under the law shall not be abridged or denied because of sex."

constructive trust based upon a finding of a confidential relationship, we must focus on either wife/husband cases subsequent to the passage of the Equal Rights Amendment or cases prior to the Equal Rights Amendment not involving wife/husband transfers, i.e., relationships in which no presumptions were present.

Appellee's counsel vehemently argued that there existed a confidential relationship and, therefore, that the burden was on appellant to show that the Agreement was fair. The court stated: "And I'll start with confidentiality of the relationship, and I will tell you right away it doesn't cause me to focus on the burden of proof." Although the trial court did not rely on a confidential relationship in imposing the burden of proof, the relationship was critical to the determination that appellee trusted appellant's assurance that the Agreement was only temporary, as will be discussed more fully, *infra*. The ultimate decision to set aside the Pre-nuptial Agreement was anchored to the belief that the confidential relationship was the catalyst in persuading appellee to sign the Agreement.

In determining the existence of a confidential relationship, *vel non*, the lower court referred to the fact that appellee contributed two-thirds of her salary to appellant, who handled payment of their bills and opined variously: "That doesn't establish confidentiality, but it seems to me that that at least suggests some reliance on appellant" and, "[s]o there was an element of confidentiality." In the most unequivocal finding of a confidential relationship, the court opined that "[t]he fact there was a confidential relationship I don't believe in itself is dispositive," but that it should take into account that there was a confidential relationship as illuminative of why appellee trusted appellant in her belief that the purpose was "to get through this bankruptcy issue and then the matter would be at an end."

As noted, *supra, Hale* and *Tedesco* recognize that whether parties to an antenuptial agreement occupy a confidential relationship is a question of fact. In the present case, the trial court based its finding of a confidential relationship between

the parties principally on the fact that appellee paid two-thirds of her salary to appellant for payment of family expenses and that appellee's annual income was approximately fifteen to eighteen thousand dollars, working as an assistant secretary. As earlier noted, the trial judge referred to "an element of confidentiality" and "some reliance on appellant," but the only unequivocal finding of a confidential relationship was related to the "trust" appellee reposed in appellant, according to the court, in accepting the reason appellant gave for executing the Agreement. There was no finding of circumstances evincing a dependence by appellee on appellant as to the relationship. Both parties were thirty-seven years old at the time of the signing of the Agreement.

Appellant had been employed at Global Exchange Services since 1983, earning twenty dollars per hour as his regular salary and forty dollars an hour for overtime, working Saturdays and Sundays; he estimated his salary at forty thousand dollars annually. Although the trial judge made no factual findings regarding the comparable education and business experience of the parties, appellee was a high school graduate and appellant was apparently employed in a non-skilled occupation. The mental condition and state of health were never factored into the court's determination of the existence of a confidential relationship. The circumstances relied on in finding a confidential relationship relate more to a division of responsibility in the management and running of a household, rather than the dominance of one party and a subservience to that party's will by the other. On June 25, 1994, appellee and her two minor children, then ages eight and twelve years, moved into the Samuels Road home, which had been purchased by appellant with the proceeds from the sale of his townhouse, where they lived until May 3, 2001. The arrangement whereby appellee relied on appellant to make financial decisions was not unreasonable in light of appellee's financial obligations, for which appellant had expressed great concern, coupled with the responsibility appellant had assumed to provide for appellee and her minor children.

For a discussion of the elements of a confidential relationship, *see Young v. Anne Arundel County,* 146 Md.App. 526, 596, 807 A.2d 651 (2002) ("There is no presumption that the husband is the dominant partner in the marriage" and, therefore, "whether there is a confidential relationship becomes a question of fact." (quoting *Blum v. Blum,* 59 Md.App. 584, 594, 477 A.2d 289 (1984))). For examples of facts indicative of a confidential relationship, *see Tedesco, supra,* (holding that there was no confidential relationship between a husband and wife who were comparable in age, educational level, and business acumen); *Hale,* 74 Md.App. at 556–57, 539 A.2d 247 (affirming the circuit court's finding that a confidential relationship existed between a husband and wife where the wife had minimal participation in the formation of a separation agreement, where the little input she did have was channeled through the parties' attorney who previously represented the husband in "substantial business interests," and where the wife had little comprehension of the content of the agreement or that the agreement was final); *Martin,* 68 Md.App. at 145–46, 510 A.2d 608 (holding that there was a confidential relationship between a husband and wife—with the wife representing the dominant force—where the husband would surrender his paychecks to the wife in an ongoing process in which the wife attended to all the couple's household and financial matters); *Blum,* 59 Md.App. at 597, 477 A.2d 289 (holding that there was evidence to support the trial court's finding that the husband was the dominant force in the marriage because he dictated the parties' regimented shopping expeditions, budgeting constraints, food and clothing arrangements, and eventually the terms of the separation agreement, which was prepared by the parties' joint attorney); *McClellan v. McClellan,* 52 Md.App. 525, 529–32, 451 A.2d 334 (1982) (upholding the circuit court's conclusion that a confidential relationship did not exist where the wife competently and intelligently participated in the negotiations and signing of a separation agreement and where she handled family finances, prepared tax returns, and knew her husband's financial status); *Bell,* 38 Md.App. at 14, 379 A.2d 419 (holding that, although the wife

was an immigrant with limited education and business experience when compared to the husband, a confidential relationship did not exist because she had negotiated several changes to a separation agreement and questioned several other provisions contained in the agreement, which evidenced her lack of trust and confidence).

We glean from the court's opinion that it relied on the existence of a confidential relationship only as that relationship caused appellee to trust appellant when he assured her that the only purpose of the Agreement was to protect him from the creditors of appellee and her former husband. The court erred in both its finding of the existence of a confidential relationship and its consequent reliance to explain why appellee signed the Agreement.

### Summary of Factual Findings

The court found appellee had a general knowledge of appellant's property and resources stemming from the list of assets when filling out application for mortgage, the ability to own a house and car, to have a full time job, to make pretty good money by getting double overtime working all day on Sundays. Not having legal counsel, opined the court, "doesn't establish in itself anything." With respect to the voluntary, free, and full knowledge of the meaning and effect of the Agreement, the court concluded that there was an obligation "to exercise some independent learning," and that nothing prevented appellee from "having an understanding." As indicated, *supra*, the finding of a confidential relationship was in relation to the oral promise to abandon the Agreement. The only factor that the court weighed against appellant was that he found the agreement not to be fair and equitable in that the allowance to the appellee was, in the court's view, unfairly disproportionate to the worth of the property involved. As the court expressed it, "This was a pretty draconian set of terms." The court, we think, gave undue weight to the disparate distribution.

The trial judge appeared to believe the agreement to be unconscionable without finding it to be so. Citing *Hume v.*

*United States,* 132 U.S. 406, 10 S.Ct. 134, 33 L.Ed. 393 (1889), we defined unconscionability, in *Martin v. Farber, supra,* 68 Md.App. at 144, 510 A.2d 608, as an agreement "such as no man in his sense and not under delusion would make on the one hand, and as no honest and fair man would accept on the other." We further affirmed that, "[c]ourts are not possessed of unbridled discretion to undo that which the parties fairly and voluntarily assumed, even if the agreement might be deemed imprudent." *Id.*

In *Farber,* we were called upon to determine whether an antenuptial agreement was fair and reasonable. We held that the trial judge should have upheld the validity of the agreement, despite the harsh result. The husband and his wife entered into an antenuptial agreement which provided for the wife to retain control of the property she acquired either prior to or during the marriage. Pursuant to the agreement, the husband relinquished all rights in the property and estate of his wife. The wife, a thirty-nine-year-old widow and mother of two boys, inherited from her late husband real estate and $20,000 in life insurance proceeds. The husband, an electrician, had accumulated no wealth before the marriage and, during his forty-four-year marriage to his wife, surrendered his pay check to her.

When she died intestate in 1983, having accumulated assets valued at $275,000, he was appointed personal representative of his deceased wife's estate. His grandchildren filed a petition to remove him as personal representative, asserting that he had signed a valid antenuptial agreement in which he had renounced any claim to his wife's estate. Mr. Farber filed a petition for declaratory relief, alleging that the antenuptial agreement was invalid and that he was entitled to his share of the estate. The lower court imposed a constructive trust on Mrs. Farber's estate for the benefit of Mr. Farber for life, the remainder to be distributed to her heirs. Although our decision turned on the point in time that the court should look to determine fairness and reasonableness, we held:

> [The trial judge] was particularly concerned by the fact that Mr. Farber turned everything he earned over to Mrs.

Farber, and that she repeatedly assured her husband that she would take care of him. No matter how disturbing those facts may be, they do not afford an adequate base for the court's ruling.

*Id.* at 145, 510 A.2d 608.

Thus, the relinquishment in an antenuptial agreement of all rights in a spouse's estate, when the income was generated by the disgruntled spouse, in and of itself, is not grounds for setting aside the agreement.

To be sure, the court engaged in an extensive analysis, applying the factors, under *Frey,* to determine the validity of the Agreement. The thrust of appellee's argument, at trial, was not that she failed to comprehend the meaning and legal effect of the Agreement, including the rights she was relinquishing. Neither was her principal contention that she did not enter into the Agreement voluntarily and the court so found, stating, "So he asked that she enter this agreement. And [appellee] said by all means. *She didn't want him to be in that position and she was willing to enter that agreement.*" Appellee, at trial, sought to have the Agreement set aside, by invoking the factors set forth in *Frey* only as an alternative to his contention that there was a "side agreement" that induced appellee to sign the Agreement. She similarly asks us, on appeal, to consider the *Frey* factors only as an alternative to her fraud in the inducement claim.

Consequently, the trial judge, while engaging in an analysis applying the *Frey* factors, ultimately conflated those factors—most of which were resolved in appellant's favor—with appellee's "belief," "understanding," and "expectation" that the Agreement would expire, which emanated from conversations in which the parties discussed the reason for executing the Agreement. Concluding that appellee would have been bound by the Agreement if the parties had separated in 1995 or 1996—a conclusion that is an implicit declaration of the Agreement's validity until that time frame, the court articulated, as its reason for setting aside the Agreement, that "it wouldn't be so bad to give up your rights for a short period of time" and,

because appellee trusted appellant to allow the Agreement to expire "after that period of time they both anticipated this agreement would be at an end."

A fair reading of the court's oral opinion discloses ineluctably that the only basis for the court's decision to set aside the Agreement was that appellee trusted appellant and believed she was entering into what the court found was an unfair agreement because of an expectation that it would remain in effect "for a short period of time." Notably, the court did not conclude that the Agreement was invalid, applying the *Frey* factors and, as noted, resolved all of those factors, with the exception of fairness of the Agreement, in appellant's favor. Antithetical to a conclusion that the Agreement is invalid applying the *Frey* factors is the court's determination that appellee would have been bound by its terms had the parties separated and divorced in 1995 or 1996. As unfair as the terms may have been in the court's estimation, it was the expectation that they were to be of short duration that prompted the court to set aside the Agreement.

We hold that, because the court conflated the *Frey* factors with its finding that it was anticipated that the Agreement would be at an end based on conversations as to the reason for its execution, there exists no basis to set aside the Agreement. Having resolved the *Frey* factors in favor of appellant, the court erred in basing its decision on the belief or understanding of when the Agreement would expire.

### Appellee's Claim of Fraud in the Inducement

As we indicated in our discussion, *supra*, appellee states in her brief, "should the Appellate Court decline to accept the trial court's determination that appellee was wrongfully induced to enter into the Agreement or, should it decide that all parol evidence should have been excluded, the central question remains, that is, is the Agreement as written valid?" In other words, validity of the Agreement, under *Frey*, is appellee's alternative argument. Appellee's counsel argued to the trial judge, "She indicated had it not been for that promise

she would not have signed it. This is fraud in the inducement. This is a misstatement inducing her to sign the agreement."

Notwithstanding that appellee's counsel clearly raised fraud in the inducement, the trial judge never addressed the issue. The trial judge's opinion concluded that the "impetus for [the] agreement was concern ... that he might somehow have to defend himself or his assets from some claim of creditor of [appellee]...." The court also found that it was understood that the agreement was to be in place for that protection and, "[o]nce that protection went, it was not to be in effect." In view of our determination, *supra*, that there was no evidence that appellant orally promised to rescind the Agreement after the threat from appellee's creditors abated [6] and that the court referred to appellee's "belief" or an "understanding" that the terms of the Agreement would be abrogated, the essential predicate for fraud in the inducement—the false statement or promise—has not been established. Appellee's claim of fraud in the inducement, therefore, fails.

Had appellee produced evidence of appellant's promise to allow the Agreement to expire, her claim would nevertheless fail. Appellant's purported promise is for an act to be performed in the future and, as such, appellee was required to establish that appellant had the present intention not to perform in the future. As Judge Adkins, writing for this Court, said in *First Union Bank v. Steele Software Systems Corporation*, 154 Md.App. 97, 149, 838 A.2d 404 (2003) (citing *Tufts v. Poore*, 219 Md. 1, 10, 147 A.2d 717 (1959)):

A fraudulent pre-existing intent not to perform a promise made cannot be inferred from the failure to perform the

---

6. In reality, the terms of the Agreement afforded appellant no more protection from appellee's bankruptcy creditors than the laws of this State would have already provided. Maryland Code (1991 Repl.Vol.), Fam. Law (F.L.) § 4–301, titled, "Protection from liability for spouse's obligations," which was in effect in 1994, stated that "(1) [a]n individual is not liable for: (i) any debt contracted by the individual's spouse before the marriage; or (ii) any claim or demand against the spouse before the marriage [and] (2)[t]he debtor spouse and that spouse's property are liable for the debt as if the marriage had not occurred."

promise alone. But it may be considered with the subsequent conduct of the promisor and the other circumstances surrounding the transaction in sustaining such an inference. And it has been stated that under certain conditions, a failure or refusal to perform is strong evidence of an intent not to perform the promise at the time it was made, as where only a short period of time elapses between the making of the promise and the failure or refusal to perform it, and there is no change in the circumstances.

*Id.* at 149, 838 A.2d 404.

The length of time from May 27, 1994 to February 1996 and the change in circumstances, i.e., the increasing discord between the parties, are indicative of the subsequent formation of the intent not to perform rather than "strong evidence" of an existing fraudulent intent not to perform in the future.

We hold, therefore, that the trial court erred in its factual finding that the evidence established that appellant made an oral promise to appellee and in setting aside the Agreement while finding that the factors enunciated in *Hartz* and *Frey* weighed in favor of the validity of the Agreement. Finally, the issue of fraud in the inducement, although raised, was never addressed by the court and is without merit because of the absence of the essential predicate, *viz.*, evidence of appellant's promise. As a postscript, the error which permeated these proceedings would probably have been averted if the lower court had considered each of the three contentions raised by the parties separately and issued three distinct and discrete rulings, responding to each.

**JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY REVERSED; CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY APPELLEE.**