865 A.2d 563

**Wendy J. CANNON**

v.

**John A. CANNON.**

**No. 48, Sept. Term, 2004.**

Court of Appeals of Maryland.

Jan. 12, 2005.

Lucien T. Winegar, Frederick, for Petitioner.

James S. Maxwell (Brian M. Barke of Maxwell & Barke, L.L.C., on brief), Rockville, for Respondent.

BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

HARRELL, Judge.

We issued a writ of certiorari in this case to re-examine the proper analysis of challenges to antenuptial agreements in Maryland law and the role, if any, in that analysis of an asserted confidential relationship between the parties to such agreements. As to the latter, we maintain that a confidential relationship exists, as a matter of law, between the parties at the formation of the antenuptial agreement, consistent with *Levy v. Sherman,* 185 Md. 63, 43 A.2d 25 (1945), *Hartz v. Hartz,* 248 Md. 47, 234 A.2d 865 (1967), and *Frey v. Frey,* 298 Md. 552, 471 A.2d 705 (1984).

The present case began in 1992 when Wendy Santilhano (hereinafter referred to as Mrs. Cannon) and John Cannon became engaged to be married. The parties thereafter signed, and had notarized, an antenuptial agreement (the Agreement) prior to the wedding. The Agreement stated that each would retain sole title to any property acquired in their individual capacities prior to the marriage (including Mr. Cannon's home), remain solely liable for any debt individually incurred prior to and during the marriage, and mutually waived alimony and marital property rights. The parties married on 25 June 1994.

In 2001, the parties separated. Mrs. Cannon, and her children from a previous marriage, moved out of Mr. Cannon's home. Mrs. Cannon filed for an absolute divorce in the Circuit Court for Frederick County in July of 2002, alleging, among other things, that the Agreement was invalid and that she was entitled to alimony and an equitable share of the marital property. After a hearing, the Circuit Court concluded, as explained in an oral opinion rendered on 26 March 2003, that the Agreement was invalid. A critical factor in the trial court's reasoning was its finding that the parties expressed an oral intent to enter the antenuptial agreement principally to protect Mr. Cannon's assets and finances from undefined spillover consequences flowing from a bankruptcy proceeding initiated by Mrs. Cannon prior to their marriage. The trial court apparently was of the mind that the existence of a confidential relationship between the parties justified Mrs. Cannon's reliance on this intent in entering the Agreement, but did not serve as a permanent waiver of her asserted marital rights. The Agreement, according to the trial judge, was but a temporary measure to protect Mr. Cannon from her creditors—a threat that allegedly abated no later than 1996. Accordingly, the Circuit Court concluded that the Agreement ceased to be valid and enforceable after that time, even though its terms were silent as to the duration of the Agreement or the perceived oral intent.

Mr. Cannon appealed this interlocutory decision to the Court of Special Appeals.[1] In *Cannon v. Cannon,* 156 Md. App. 387, 846 A.2d 1127 (2004), the intermediate appellate court reversed the trial court, holding that the alleged oral

---

1. Both parties assert, and we agree, that an appeal of the Circuit Court's interlocutory ruling on the validity of the Agreement is authorized. While not a final judgment under § 12–301 of the Courts and Judicial Proceedings Article of the Maryland Code, appellate court jurisdiction is appropriate for the interlocutory appeal of an order for the payment of money. Mrs. Cannon was awarded *pendente lite* alimony as a consequence of the invalidation of the Agreement. *See* Md.Code (1973, 2002 Repl. Vol.), § 12–303(v) of the Courts and Judicial Proceedings Article; *Frey v. Frey,* 298 Md. 552, 556–57, 471 A.2d 705, 707 (1984).

intent had been weighed too heavily in evaluating the purported unfairness of the antenuptial agreement. Employing factors from *Hartz*, where we outlined the appropriate analysis for challenges to the validity of antenuptial agreements, the Court of Special Appeals declared the antenuptial agreement valid and remanded the matter for further proceedings. Mrs. Cannon filed a petition for a writ of certiorari with this Court, which we granted. *Cannon v. Cannon*, 382 Md. 346, 855 A.2d 349 (2004).

Mrs. Cannon raises two issues for our consideration, which we reorder and rephrase as follows:

I. Whether the Court of Special Appeals and the Circuit Court erred in holding that the existence of a confidential relationship between the parties to an antenuptial agreement was a matter of fact to be determined on a case-by-case basis, rather than presumed to exist in every such case as a matter of law.

II. Whether the Court of Special Appeals misapplied the clearly erroneous standard in declaring the Agreement valid under the factors discussed in *Hartz* and *Frey*.

We shall affirm the judgment of the Court of Special Appeals, but on different grounds than those employed by that Court. In so doing, we shall restate the Maryland standard for evaluating antenuptial agreements and the role of the confidential relationship that exists between both parties, as a matter of law, to such agreements.

I.

A.

Mrs. Cannon met Mr. Cannon in 1977 at a wedding she attended with her first husband. An intimate romantic relationship between the Cannons commenced in 1986. While waiting for entry of an absolute divorce ending her first marriage (which eventually occurred in October 1990 after a separation agreement was consummated with her first husband), Mrs. Cannon and her two children began living with

Mr. Cannon in his town house in July 1990. By November 1992, the Cannons had become engaged. They declared their intent to save money to purchase a larger home and pay for the eventual marriage ceremony. At the time of the engagement, Mrs. Cannon, a high school graduate, earned between $15,000 and $19,000 in annual wages (as a secretary) and received an additional $7,200 in annual child support. Mr. Cannon, possessor of an associate's degree, was earning approximately $40,000 per year as an employee of GE Global Exchange Services.

In September 1993, Mr. Cannon purchased a new home in New Market (the New Market home) with the net proceeds from the sale of his town house and a mortgage. He titled the New Market home solely in his name. Mrs. Cannon and her two children moved into the New Market home and she began paying Mr. Cannon between $500 and $800 per month towards the mortgage debt and general living expenses.

In April 1994 Mr. Cannon broached with Mrs. Cannon the topic of an antenuptial agreement because he was concerned about a prior bankruptcy proceeding initiated by Mrs. Cannon and her first husband. Mr. Cannon professed to be concerned that some of Mrs. Cannon's creditors might pursue his pre-marital assets and any jointly-held assets acquired after they were married.[2] Mr. Cannon testified that he presented the proposed Agreement[3] to Mrs. Cannon on or about

---

**2.** Neither party offered specific evidence or argument at the hearing in the Circuit Court as to the exact effect the bankruptcy was anticipated to have upon either Mr. Cannon's pre-marital or their future joint assets. There was evidence presented that the bankruptcy was filed in February 1986 and that the threat, if one existed at all, would lose its efficacy by 1996. Mr. Cannon, who the trial court generally credited in its oral opinion as the more credible witness of the two parties, stated that he did not know, when he executed the Agreement, when the alleged threat from her creditors would end.

**3.** The portions of the Agreement of particular relevance to this case provided:

RECITALS

The parties stipulate and recite that:

\* \* \*

Note 3—Continued

C. Each of the parties has made a full and complete disclosure to the other party of all of his or her own property and assets and of the value thereof, to the best of the disclosing party's knowledge. This agreement is entered into with a full knowledge on the part of each as to the extent and probable value of the estate of the other, and of all the rights conferred by law on each in the estate of the other by virtue of said proposed marriage.

D. Each of the parties has made a full and complete disclosure to the other party of all of his or her income, expenses, and debts, to the best of the disclosing party's knowledge. This agreement is entered into with a full knowledge on the part of each as to the income, expenses, and debts of the other, and of all the rights conferred by law on each to alimony, support and maintenance by virtue of said proposed marriage.

\* \* \*

SECTION ONE
FULL KNOWLEDGE OF BOTH PARTIES

This Agreement is entered into by the parties hereto with full knowledge on the part of each of the income, expenses, and debts of the other, and of the extent and probable value of all of the property or estate of the other, and of all rights that, but for this Agreement, would be conferred by law upon them, in the income, property or estate of the other, by virtue of the consummation of the said proposed marriage; and the rights of the respective parties hereto in and to each other's estate and property, of whatsoever character the same may be, shall be determined, fixed and settled by this Agreement, and not otherwise.

\* \* \*

SECTION SEVEN
RETIREMENT BENEFITS

Each party agrees that any "retirement benefits," titled in the other party's name alone, whether acquired prior to or during the marriage, shall remain the separate property of the other party. During the marriage and in the event of divorce or dissolution of the marriage, each party hereby waives any right, title and interest that he or she may have in any "retirement benefits" in which the other party now has or may hereafter acquire any interest whatsoever. "Retirement benefits" shall include any pension, profit sharing, retirement and deferred compensation (including but not limited to IRA's, Keough's, SEPP's, 401(k)'s, 403(b)'s, TSA's, TDA's, CSRS, FERS).

\* \* \*

SECTION FOURTEEN
INDEPENDENT COUNSEL

The parties acknowledge that each has been free to seek the advice of independent counsel of his or her own choosing in negotiation and execution of this Agreement, and that the provisions of this Agreement constitute a reasonable and adequate settlement of their respective alimony, support, property rights, and personal rights. The parties further agree that each will be responsible for his or her own legal fees incurred in the preparation and negotiation of this Agreement.

10 May 1994 for her review. She signed and had the Agreement notarized on 27 May 1994. The Agreement included sections that preserved individually titled personal property to each party in accordance with a schedule incorporated by reference (and attached to the Agreement), fixed liability for debts incurred by either party both prior to and during the anticipated marriage, compelled Mrs. Cannon to pay Mr. Cannon $1,000.00 per month for household expenses during the marriage (including mortgage, home maintenance, and utilities), mutually waived alimony if the Cannons divorced, preserved Mr. Cannon's right to the New Market home (which remained titled solely in his name), and allowed Mr. Cannon the right to eject Mrs. Cannon from the New Market home after providing sixty days notice, but allowed her and her children exclusive use of the home during that sixty day period.

Both parties contested before the Circuit Court the amount of discussion between them regarding the Agreement prior to its execution. They also contested the level of knowledge each had about the other's finances at the time of execution of the Agreement. Mrs. Cannon at first maintained that there was no discussion of the Agreement before she signed it, but later conceded that at least Mr. Cannon advised her that she would pay $1,000 per month for household costs (mortgage and

---

Note 3—Continued

\* \* \*

SECTION EIGHTEEN
GOVERNING LAW AND SEVERABILITY
\* \* \*

Should any provision of this Agreement be found, held or deemed to be unenforceable, voidable or void, as contrary to law or public policy under the laws of Maryland or any other jurisdiction, the parties intend that the remaining provisions of this Agreement shall nevertheless continue in full force.

The Agreement did not contain a termination provision. By design, the legal obligations in antenuptial agreements do not terminate, without explicit language to the contrary, until its conditions of performance are discharged upon death or divorce of the parties. *See Cannon v. Cannon*, 156 Md.App. 387, 406, 846 A.2d 1127, 1138 (2004) (observing that the "potential of such dissolution or death is *le raison d'etre* for the Agreement.") (citing *Moore v. Jacobsen*, 373 Md. 185, 194–95, 817 A.2d 212, 217–18 (2003)).

utilities). Mrs. Cannon stated, at different times, that she never read the "contents" of the Agreement or only "glanced" at the Agreement or "skimmed over" it after it was presented to her in the New Market home. Mrs. Cannon admitted that, at the time she signed the Agreement, she knew Mr. Cannon worked full time with computers for GE Global Exchange Services, paid partially for the New Market home with proceeds from the sale of his town home, and that he owned a car. She also explained that, despite saving money with Mr. Cannon to help pay for the New Market home and the 1994 wedding, she had no savings and that she had no specific knowledge of the amount of Mr. Cannon's annual income at the time she executed the Agreement.

On redirect examination, Mrs. Cannon stated that she understood specific portions of the Agreement, including the requirement to maintain individual checking, savings, and credit card accounts. She steadfastly maintained, however, that she did not read through the Agreement before signing it in the New Market home immediately after Mr. Cannon presented it to her, despite the fact that the notary that notarized her execution of the Agreement testified that the document was signed by Mrs. Cannon at the New Market Farmers and Mechanics Bank.

Mr. Cannon testified that he discussed his finances and income with Mrs. Cannon, prior to the execution of the Agreement, when he completed the mortgage financing forms to purchase the New Market home. While he admitted that he did not tell her the purchase price of the property nor his exact annual income, he maintained she had actual knowledge of the extent of his real and personal property, his full-time job, and that he had "thousands of dollars" in a retirement account.[4] He stated that he asked her continuously about the Agreement after she received it on 10 May. He claimed that he advised her to seek an attorney or outside advice before she signed the Agreement, which she declined to do. Mr.

---

4. The retirement account contained approximately $60,000 at the time the Agreement was executed.

Cannon also pointed to Mrs. Cannon's divorce and the separation agreement negotiated with her first husband, both attained with the advice of counsel, as indicators that she was not unaware of the operation of similar agreements and the desirability of legal advice and/or representation in such matters.

Contrary to her earlier statement on direct examination that she signed the Agreement on the same day it was presented to her and without substantive discussion about it with Mr. Cannon, Mrs. Cannon testified on rebuttal that Mr. Cannon, while not asking her daily in "a continuous barrage" that she sign the Agreement, did ask her about the Agreement post-delivery.[5]

### B.

The Circuit Court weighed the question of the validity of the Agreement using an analytical approach espoused by Mrs. Cannon.[6] First, the trial court assessed whether the Agree-

---

5. The Circuit Court, in its oral opinion, stated the following regarding the conflicting evidence on Mrs. Cannon's receipt and eventual execution, without any discussion, of the Agreement, "[t]he benefit of telling the truth is you don't have to remember what you said. I, I think Ms. Cannon's not being candid with the Court and I'm being real blunt."

6. Mrs. Cannon's five factor test was gleaned from John F. Fader, II & Richard J. Gilbert's *Maryland Family Law*, which summarized what it considered five "important considerations to determine the validity of a premarital agreement." Although we do not know which edition the Circuit Court relied upon in its reasoning, we will refer to the Third Edition, originally published in 1990 and updated with a 2004 Cumulative Supplement. The "five important considerations" enumerated are,

[1] fair and equitable in procurement and result[; 2] parties must make frank, full and truthful disclosure of all their assets[; 3] the agreement must be entered voluntarily, freely and with full knowledge of its meaning and effect[; 4] the importance of independent legal advice in evaluating whether the agreement was voluntarily and understandingly made is emphasized[; 5] there is a confidential relationship between the parties which, if a contest to validity occurs, shifts the burden of proof to the one attempting to uphold the agreement to prove that it is fair and equitable.

Fader & Gilbert, *supra*, at § 14–2(b).

ment was fair and equitable, concluding at one point that the Agreement was fair and equitable when considered in light of the claimed bankruptcy issues at the time it was executed. It explained that the Agreement was valid, fair, and equitable if it were to be analyzed when the threat of bankruptcy complications presumably still existed through 1996.

The trial court summarized the extent of disclosure between the parties prior to execution of the Agreement and whether the disclosure was full, frank, and truthful. The court credited Mr. Cannon's testimony that at least "some discussion" had occurred with Mrs. Cannon about his assets when he applied for a loan to purchase the New Market home. Mrs. Cannon had knowledge of Mr. Cannon's ability to qualify for financing to purchase the home, buy a car, and keep a full-time job with "some pretty good money" working weekend overtime. The trial court also observed that Mr. Cannon did not have full knowledge of the potential liability to him, if any, from Mrs. Cannon's bankruptcy filing.

The Circuit Court concluded that Mrs. Cannon appreciated the legal effect of the Agreement and entered the Agreement voluntarily. The court reasoned that Mrs. Cannon entered the Agreement voluntarily because "[o]ne has some obligation to exercise some independent learning as to what's going on. I don't think that anything prevented Ms. Cannon from having an understanding." As to Mrs. Cannon's declination to seek legal advice, the trial court concluded that she was not discouraged from seeking legal advice and her independent choice to remain unadvised did not affect adversely the validity of the Agreement.

Lastly, the Circuit Court addressed the existence of a confidential relationship between the parties. It stated that the issue of a confidential relationship "doesn't cause me to focus on the burden of proof" and that "the issue of confidentiality in the relationship goes beyond that." It explained that the parties' pre-marital living arrangements and Mrs. Can-

non's monthly contributions of $500 to $800 for expenses did not establish confidentiality yet "suggests some reliance." In what appears to be the only portion of the oral opinion explaining why the court ultimately concluded that the Agreement was invalid, the court stated,

> there was a confidential relationship to the extent that Ms. Cannon was justified or I'd say should, ah, maybe it's not justified [sic] is the right word. But Ms. Cannon understandably believed that the purpose was to get through this bankruptcy issue and then the matter would be at an end.... I think there is some justification therefore for her not spending as much time dwelling on it, and I accept the facts that she, under those circumstances, made, knew as much as she needed to know.

The court, after declaring the Agreement invalid after 1996, ordered *pendente lite* alimony paid to Mrs. Cannon.

## C.

The Court of Special Appeals reversed the trial court, declaring the Agreement valid. It agreed with the trial court that consideration of the evidence regarding the following factors favored the validity of the Agreement: disclosure; knowledge of the effect of the Agreement; and whether independent legal advice was or could have been sought. *Cannon,* 156 Md.App. at 409–412, 846 A.2d at 1140–41. Relying on its own cases decided since *Hartz* and *Levy* (and departing from the analysis in *Hartz* and *Levy*), the intermediate appellate court examined the existence of a confidential relationship as a question of fact. *Id.* at 412–15, 846 A.2d at 1141–43. It explained that the trial court both misapplied the analysis of the existence of a confidential relationship and, though apparently finding one to exist, erred in its application of the existence of the confidential relationship as a factor in determining the alleged invalidity of the Agreement.

## II.

### *The Evolution of the Legal Analysis of Antenuptial Agreements in Maryland*

#### A.

##### *As Contracts Generally*

In its broadest sense, an antenuptial agreement is, of course, a contract. Thus, from the earliest reported cases of this Court on the subject to the present time, we review antenuptial agreements under the objective law of contract interpretation. *Herget v. Herget*, 319 Md. 466, 470, 573 A.2d 798, 800 (1990) (holding that the terms of antenuptial agreements are subject to the objective law of contract interpretation); *Naill v. Maurer*, 25 Md. 532, 538–39 (1866) (holding, in an appeal regarding a widow's right for an allowance of dower, that an antenuptial agreement is a question of contract interpretation that, as a contract validly entered, barred the widow's claim); *Ward v. Thompson*, 6 G. & J. 349, 356–57 (1833) (holding valid an antenuptial agreement compelling the husband to surrender all rights to his wife's personal and real property in trust, even upon death of the wife, where the antenuptial agreement had no language limiting the power of the trustee to distribute the property upon death of the wife). We examine the terms of antenuptial agreements for good faith, consideration, and the parties' objective intent, even as to provisions barring or preventing accrual of the legal and equitable rights to property of the soon-to-be-wed spouse upon the death of the other. *Naill*, 25 Md. at 538. Although perhaps based in part on legal fiction and part societal norm, we have stated that the consummation of the marriage is itself sufficient consideration for the antenuptial agreement (but not because it constitutes partial performance). *Id.*; *Busey v. McCurley*, 61 Md. 436, 442–45, 48 Am.Rep. 117 (1884) (antenuptial agreement valid on its face with marriage as consideration); *Crane v. Gough*, 4 Md. 316, 333–34 (1853) (holding that marriage is sufficient consideration for an antenuptial agreement, but not as part performance); *see also Schnepfe v. Schnepfe*, 124 Md. 330, 337, 92 A. 891, 893–94 (1914) (observ-

ing that courts of equity long had exercised jurisdiction over antenuptial agreements based on marriage as consideration) (citing *Naill v. Maurer,* 25 Md. 532 (1866)).

Like other contracts, antenuptial agreements also are assailable by a contesting party for fraud, duress, coercion, mistake, undue influence, or a party's incompetence. *See* *Wlodarek v. Wlodarek,* 167 Md. 556, 560–67, 175 A. 455, 456–59 (1934) (affirming overruling of demurrers by estate of deceased father and his daughter where evidence of fraud and misrepresentation in signing an antenuptial agreement was presented); *Scher v. Becker,* 163 Md. 199, 202–203, 161 A. 167, 168 (1932) (demurrer by the estate of the husband overruled where the widow sought to claim her marital rights barred by an antenuptial agreement entered based on fraudulent misrepresentation); *Naill,* 25 Md. at 538 (antenuptial agreement showed no evidence of fraud or incompetence). A party seeking to invalidate an antenuptial agreement also could attempt to prove unconscionability at the time the contract was entered. *See Martin v. Farber,* 68 Md.App. 137, 143–45, 510 A.2d 608, 611 (1986) (holding antenuptial agreement not unconscionable because trial judge "palpably relied on circumstances arising after the execution of the agreement").

Ordinarily, "[t]he law presumes every [person] to be capable of making a valid deed or contract." *Williams v. Moran,* 248 Md. 279, 285, 236 A.2d 274, 278 (1967) (quoting *Williams v. Robinson,* 183 Md. 117, 121, 36 A.2d 547, 549 (1944)). When a party attacks the validity of a contract as invalid under fraud, duress, coercion, mistake, undue influence, or incompetence, normally that party bears the burden of proof.[7] *Dreisonstok v. Hoffman,* 209 Md. 98, 102, 120 A.2d 373, 376 (1956) (holding that the burden of proof lies upon

---

7. In other causes of action in contract, a party seeking enforcement of a contract may bear the burden of proof. *Taylor v. NationsBank, N.A.,* 365 Md. 166, 175, 776 A.2d 645, 652 (2001) (holding the party seeking relief from an alleged breach of contract bears the burden of showing that a valid contractual obligation existed and that the alleged breaching party actually breached the agreement).

party alleging fraud by "clear and indubitable proof"); *Williams v. Moran,* 248 Md. at 285, 236 A.2d at 278–79. If the attacking party meets its initial burden of production, the burden of production may shift to the party seeking to enforce the contract. Thus, when the party seeking to enforce a contract files the initial complaint, shoulders the burden of proving that the contract is valid and generates a prima facie case to that end, the defending party (the party seeking to invalidate the contract) bears the burden of production as to the defenses of fraud, duress, coercion, mistake, undue influence, or incompetence. In any scenario, the burden of proof by which the responsible party must satisfy the finder-of-fact in order to win a verdict in its favor does not shift during the trial. Lynn McLain, *Maryland Practice, Vol. 5, Maryland Evidence State & Federal,* 244, 324 (2001). In a generic contract dispute, regardless of who initiates litigation, a party seeking to invalidate a contract who demonstrates that a confidential relationship existed between the parties thrusts the burden of proof to establish the validity of the contract on the party attempting to enforce the contract. *Williams v. Moran,* 248 Md. at 285, 236 A.2d at 278–79 (citations omitted).

## B.

### *Antenuptial Agreements Specifically*

In *Levy v. Sherman,* 185 Md. 63, 73–74, 43 A.2d 25, 31–32 (1945), we extended our analysis of antenuptial agreements beyond traditional contract analysis when we held invalid an antenuptial agreement because the party seeking to enforce the agreement failed to meet the ultimate burden of proof fixed by the existence of a confidential relationship between the parties. We stated that, when evaluating such disputes, "an antenuptial contract is entered into in contemplation of marriage, whether the parties are engaged to marry at the time or not, it is required of *each* to make a frank, full, and truthful disclosure of their respective worth in real as well as

personal property." [8] *Id.* at 73, 43 A.2d at 29 (emphasis added). We acknowledged that a confidential relationship existed as a matter of law between a man and a woman in contemplation of an antenuptial agreement where marriage was its consideration. Without disclosure by each party and where "the allowance provided in the agreement is unfairly disproportionate to the worth at the time [of execution of the contract], the concealment gives rise to the implication of fraud, and the burden of proof is cast on those claiming under it when the instrument is attacked, to show that it was entered freely, voluntarily, and knowingly and that each was given the opportunity to obtain independent legal advice." *Id.* at 73–74, 43 A.2d at 29.

The consequence of the existence of a confidential relationship was twofold. First, the burden of proof was allocated to the party seeking to enforce the agreement, regardless of

---

8. Antenuptial agreements were unlike pre-separation agreements, even at common law, between a husband and wife. *See Hewitt v. Shipley,* 169 Md. 221, 226, 181 A. 345, 347 (1935). A confidential relationship between a husband-and-wife entering a pre-separation (or post-marital) agreement made with the intent of limiting the marital rights (provided under Family Law Article § 8–101) is a question of fact that may be proven by the party seeking to attack the agreement in order to shift the burden of proof to the party seeking to enforce the agreement. *See Williams v. Williams,* 306 Md. 332, 337, 508 A.2d 985, 988 (1986) (observing that circuit court made no factual findings as to a confidential relationship between the husband and wife before entering into a separation and property settlement agreement). Antenuptial agreements are different from pre-separation agreements in their formation and development because they rely upon marriage as consideration. In addition, the marital rights addressed in the Family Law Article of the Maryland Code have not yet attached when the antenuptial agreement is entered because the parties are not "husband" and "wife." Maryland's Family Law Article expressly provides that a "husband and wife may make a valid and enforceable deed or agreement that relates to alimony, support, property, or personal rights" or a "valid and enforceable settlement" of those same rights. Md.Code (1984, 1999 Repl. Vol.), § 8–101(a) & (b) of the Family Law Article. Because of these differences, cases concerning pre-separation agreements between a husband and wife are not useful in evaluating the relationship that exists between parties contemplating an antenuptial agreement where the pending (and potentially ill-omened) marriage is the consideration supporting the contract.

gender, as a means to prevent fraud. Second, a party seeking to enforce an antenuptial agreement in reliance on the objective contract interpretation theory came to court with its quiver of litigious arrows half-empty unless it was prepared to meet its assigned burden of proof. For example, after placing the burden of proof on the estate of Mr. Levy (which sought to enforce the agreement), the court held that there was "nothing to show that a full disclosure of Levy's worth was made to appellant at the time, nor that she was advised of the rights she would acquire in Levy's properties upon marriage, and there is a total want of evidence to show that she had the benefit of independent legal advice." *Id.* at 78, 43 A.2d at 31–32.

After *Levy,* we infrequently considered the issue of the validity of antenuptial agreements. *Frey v. Frey,* 298 Md. 552, 471 A.2d 705 (1984); *Hartz v. Hartz,* 248 Md. 47, 234 A.2d 865 (1967); *Cohn v. Cohn,* 209 Md. 470, 121 A.2d 704 (1956) (holding invalid a provision in an antenuptial agreement that waived a spouse's right to alimony void, as a matter of law, because it violated public policy in favor of preserving marriage), *overruled by Frey v. Frey,* 298 Md. 552, 563, 471 A.2d 705, 710 (1984); *Ortel v. Gettig,* 207 Md. 594, 116 A.2d 145 (1955). In *Ortel,* we evaluated the evidence to enforce an antenuptial agreement and determined it to be insufficient to support the validity of the agreement. We observed that all antenuptial agreements, even those entered into for convenience, were made between two parties involved in a confidential relationship and that each had the responsibility to the other to make a disclosure of their respective assets. *Ortel,* 207 Md. at 608–10, 116 A.2d at 152. Neither Mr. Gettig nor the eventual Mrs. Gettig made a full disclosure of his or her net worth as of the time the antenuptial agreement was executed, even though he held a minimum of $75,000 and she $10,000 in assets. Because the estate of Mr. Gettig sought to enforce the antenuptial agreement, the burden of proof was placed on the estate to show that a disclosure of Mr. Gettig's assets was made prior to Mrs. Gettig's waiver of property rights in Mr. Gettig's estate in the antenuptial agreement.

After noting that Mr. Gettig provided less than a full disclosure of his assets at the time the antenuptial agreement was signed, we explained,

[t]he appellant seeks to supply the lack of such proof by attempting to show that the appellee knew what his worth was. She did have, as she testified, knowledge of the fact that the husband had an electrical business and supposed that he owned the business properties and two lots improved by three houses in a waterfront neighborhood in Baltimore County, one of which houses, at least, was quite a substantial building. We find nothing to show that she knew the actual value of the electrical business or of any of the real estate, or what if anything he owned, or what intangible property he may have owned. Such indefinite knowledge or information falls far short of actual knowledge of his worth.

*Id.* at 612, 116 A.2d at 153. Thus, Mrs. Gettig, who signed the antenuptial agreement the night it was presented to her and without the benefit of prior discussion or the reasonable opportunity to seek independent legal advice, received neither a full and fair disclosure of Mr. Gettig's assets nor possessed knowledge of their worth before entering the agreement.

We revisited the subject of antenuptial agreements in *Hartz v. Hartz,* holding that "overreaching" was the correct yardstick for measuring their validity. *Hartz,* 248 Md. at 57, 234 A.2d at 871. Mrs. Hartz sought to invalidate an antenuptial agreement that barred her right to the property and estate of her deceased husband. *Id.* at 49, 234 A.2d at 866. The agreement recited that Mrs. Hartz had " 'full knowledge' of the 'extent and probable value'. . ." of Mr. Hartz's assets; yet, the trial court held that the disclosure was not full and frank without a disclosure of the value of Mr. Hartz's estate and subsequently invalidated the agreement. *Id.* at 54–55, 234 A.2d at 869. At the time of the agreement, both Mr. and Mrs. Hartz held real property in excess of $160,000, and, although neither side divulged the exact worth of their respective assets, both sides had estates of substance that each wished to protect for the benefit of their respective blood heirs as

existed prior to the pending marriage.[9] *Id.* at 51–54, 234 A.2d at 867–69.

We explained that the trial court's analysis, which relied solely upon the lack of full and frank disclosure of the nature and value of the assets of Mr. Hartz (the party seeking to enforce the agreement), was incomplete. *Id.* at 55, 234 A.2d at 869–70. "The real test in a determination of the validity of an antenuptial agreement is whether there was *overreaching,* that is, whether in the atmosphere and environment of the confidential relationship there was unfairness or inequity in the result of the agreement or in its procurement." *Id.* at 57, 234 A.2d at 871 (emphasis added). While we did not require a trial court to incant these words in its analysis as "magic words" or recite a particular "mantra" in determining the validity of an antenuptial agreement, we made clear that a court must come to some conclusion about the unfairness or inequity of the agreement at the time it was entered and if an overreaching had occurred.

We also provided guidance, as a roadmap for practitioners and the courts of our State, for how to evaluate the validity of antenuptial agreements under this overreaching standard. After recognizing the importance of the confidential relationship that existed between the parties, which compelled the party seeking to enforce the agreement to shoulder the ultimate burden of proof, we reiterated that "this confidential relationship calls for frank, full and truthful disclosure of the worth of the property, real and personal, as to which there is a waiver of rights in whole or in part, so that he or she who waives can know what it is he or she is waiving." *Id.* at 56–57, 234 A.2d at 870–71 (footnote omitted). "[A]dequate knowl-

---

**9.** The initial draft of the antenuptial agreement was drawn at Mrs. Hartz's request. Her lawyer testified that Mrs. Hartz told him that she knew that Mr. Hartz was an owner or part-owner of an ice cream company and had a farm in Virginia. *Hartz,* 248 Md. at 53, 234 A.2d at 869. When Mrs. Hartz and her lawyer presented the agreement to Mr. Hartz, his lawyer recommended that both parties sign the agreement to protect fully their respective estates upon the death of the other. *Id.* at 54, 234 A.2d at 869.

edge [by the spouse attacking the validity of the agreement] of that frank, full and truthful disclosure would reveal . . ." could serve as a substitute for a less-than-complete disclosure at the time the agreement was entered. *Id.* at 57, 234 A.2d at 871.

In addition to the duties imposed by a confidential relationship to make a frank, full, and truthful disclosure (or prove knowledge) *and* to evince that the allowance made to the party waiving his or her rights was not unfairly disproportionate, the enforcing party was expected to prove that the antenuptial agreement "was entered into voluntarily, freely and with full knowledge of its meaning and effect." [10] *Id.* If an inadequate disclosure and an unfairly disproportionate allocation existed, "the validity of the agreement must be tested by other standards—that is, was the benefit to the wife [the party attacking the agreement] commensurate with that which she relinquished so that the agreement was fair and equitable under the circumstances—and did the subsequent would-be repudiator of the contract enter into the agreement freely and understandingly." *Id.* at 58, 234 A.2d at 871–72. We further explained that it was possible the party seeking to enforce the agreement could meet this burden even if he or she did not make a proper disclosure or that the opposing party lacked precise knowledge of the rights it was waiving. *Id.* at 58, 234 A.2d at 872 (citing Lindey, *Separation Agreements & Antenuptial Contracts*, § 90–44).

In *Hartz,* we held that "[t]he record demonstrates that there was no fraud, actual or implied, no overreaching, no unfairness and no pressure leading to the execution of the agreement." *Id.* at 60, 234 A.2d at 872. Mrs. Hartz had "at least an approximately definite knowledge of the value of the

---

**10.** We strongly encouraged throughout *Hartz* that a party drafting an antenuptial agreement complete a frank, full, and truthful disclosure document. For example, we explained that "[t]he careful practitioner has often caused to be prepared an itemization of the property covered by the agreement with appraised values and caused it to be made part of the agreement." *Hartz,* 248 Md. at 57, n. 3, 234 A.2d at 871, n. 3. We also explained that such a written disclosure may be "the key that turns the lock of the door leading to impregnable validity" of the antenuptial agreement. *Id.* at 57, 234 A.2d at 871 (footnote omitted).

property as to which of those rights were being released ...,"
and that level of knowledge was sufficient to support the
validity of the antenuptial agreement.[11] *Id.* at 63, 234 A.2d at
874. She conceded that she signed the agreement freely and
voluntarily; indeed, she would have been hard-pressed to
state otherwise because the agreement was proposed by her
and initially drafted by her attorney.

We concluded by stating,

[i]n summary, we think that the record shows that the
agreement was entered into freely and voluntarily, with full
understanding of the rights being waived and with at least
an approximately definite knowledge of the value of the
property as to which of those rights were being released
and that the results of the agreements were fair and
equitable under the circumstances. Mrs. Hartz is bound by
the agreement.

*Id.* at 63, 234 A.2d at 874 (citations omitted).

In *Frey v. Frey,* we considered an argument that a bar
against antenuptial agreements made in anticipation of divorce
violated Maryland public policy protecting "the institution of
marriage." 298 Md. at 560, 471 A.2d at 709. We found no
public policy existed as such in light of the evolution of
statutory no-fault divorces and the 1978 Marital Property Act
which allowed parties to agree "what property is not to be
considered marital property or family use personal property"
and thus "control the distribution of property upon divorce."
*Id.* at 562, 471 A.2d at 710 (citing Md.Code (1974, 1980 Repl.
Vol.), Courts & Judicial Proceedings Article, § 3–6A–01(c),
(e)). Until *Frey,* only those antenuptial agreements that

---

**11.** We noted throughout the opinion that Mrs. Hartz knew that Mr.
Hartz was 1) owner, part-owner, or operating head of an ice cream
company, 2) owner of a thousand acre farm in Rappahannock County,
Virginia, that she visited prior to the marriage, 3) sufficiently well off
financially to spend only two days a week overseeing the operation of
his company while spending the remainder of his time at a substantial
residence on the farm, 4) sufficiently well off to offer to pay Mrs.
Hartz's expenses for her Washington apartment, and 5) sufficiently well
off to consider paying her $500 a month for her personal expenses.
*Hartz,* 248 Md. at 51–54, 60–61, 234 A.2d at 867–69, 872–73.

disposed of rights and property upon death of the spouse were valid; any agreement, regardless of the parties' consent, that contemplated a waiver of rights or property upon divorce was void. *See Cohn v. Cohn,* 209 Md. 470, 121 A.2d 704 (1956).

We further explained that "[a]ll such antenuptial agreements, therefore, are to be evaluated upon the factors indicated in *Hartz v. Hartz,* 248 Md. 47, 234 A.2d 865 (1967)." *Frey,* 298 Md. at 563, 471 A.2d at 711. Although the underlying agreement in *Frey* was not properly before us for substantive analysis because the trial court failed to evaluate the antenuptial agreement beyond ruling it to be void as a matter of public policy, we reiterated, for the benefit of the trial court on remand, the key elements of *Hartz.* After summarizing these elements, we stated again that the "real test" of an antenuptial agreement was whether overreaching in the atmosphere and environment of the confidential relationship had occurred. *Id.* at 564, 471 A.2d at 711 (quoting *Hartz,* 248 Md. at 57, 234 A.2d at 871).

After our decision in *Frey,* analysis of the validity *per se* of antenuptial agreements has been undertaken only by the intermediate appellate court. This has drawn some scrutiny from legal commentators.[12] *See* John F. Fader, II & Richard J. Gilbert, *Maryland Family Law* 14–5 (3rd. ed. 1990) (stating "Now what does all of this mean? There is not much help in answering this question from the appellate courts in Maryland. They have not had the opportunity to clarify issues because there has been little litigation in the area.").

In *Martin v. Farber,* 68 Md.App. 137, 510 A.2d 608 (1986), the Court of Special Appeals held that an otherwise valid antenuptial agreement could be challenged nonetheless as unconscionable; unconscionability to be analyzed in the context as of the time the agreement was entered. In 1939, Mr. Farber entered an antenuptial agreement with his affianced

---

**12.** Interpreting the *terms* of presumably valid antenuptial agreements, as exercises in contract interpretation, however, has occurred since *Frey* in both appellate courts. *Herget v. Herget,* 319 Md. 466, 573 A.2d 798 (1990); *Heineman v. Bright,* 140 Md.App. 658, 782 A.2d 365 (2001).

bride three days before the wedding, waiving his right to all the property that she acquired prior to, or would acquire during, the marriage.[13] *Id.* at 139, 510 A.2d at 608–609. The trial court determined that the agreement was valid on its face; yet, it would not enforce the agreement "because it would be unconscionable to do so." *Id.* at 143, 510 A.2d at 611. The trial court determined that the result of the ante-nuptial agreement forty-four years later would leave approximately $275,000 in assets, titled in Mrs. Farber's name and partly acquired from Mr. Farber's wages during the marriage, to Mrs. Farber's grandchildren from her first marriage. *Id.* at 139–40, 510 A.2d at 609. Mr. Farber would be left without a share of her intestate estate. *Id.* at 140, 510 A.2d at 609. The Court of Special Appeals examined the evidence as it existed at the time the agreement was executed. It reversed the trial court, explaining that, at the time the agreement was executed, "[n]othing in the Farbers' antenuptial agreement or in the circumstances surrounding its execution renders it unconscionable or otherwise legally objectionable." *Id.* at 144, 510 A.2d at 611. The intermediate court held that the trial court misapplied the doctrine of unconscionability when it examined the consequences of the contract forty-four years after its execution.

In *Herget v. Herget,* the Court of Special Appeals held valid an antenuptial agreement. 77 Md.App. 268, 550 A.2d 382 (1988), *rev'd on other grounds,* 319 Md. 466, 573 A.2d 798 (1990).[14] Mr. Herget, who sought to enforce the antenuptial

---

**13.** Mrs. Farber inherited real property in Baltimore City from her first husband and approximately $20,000 from insurance proceeds. *Martin,* 68 Md.App. at 139, 510 A.2d at 609.

**14.** The Court of Special Appeals affirmed the trial court's judgment declaring the antenuptial agreement valid, but interpreted the terms of the agreement to permit the wife to claim a monetary award in the divorce action. We issued a writ of certiorari to interpret the terms of the antenuptial agreement, not to consider its validity per se. As such, we reversed the judgment of the Court of Special Appeals and agreed with the Circuit Court that Mrs. Herget's claim to the marital property was barred by the terms of the antenuptial agreement. *Herget,* 319 Md. at 477, 573 A.2d at 803.

agreement, and Mrs. Herget attached a purportedly full disclosure of their assets and worth to the antenuptial agreement.[15] The agreement, forwarded to the Herget's as a draft on 12 September 1973 and signed on 27 September 1973, included a waiver of alimony and a surrender of all marital claims by Mrs. Herget to Mr. Herget's property. *Id.* at 272–73, 550 A.2d at 384. While Mrs. Herget did not seek independent counsel before signing the agreement, which she claimed she did not read, Mr. Herget's attorney had suggested by letter that she seek independent legal advice before signing the agreement. *Id.*

Mrs. Herget challenged the validity of the agreement, claiming that the trial court committed clear error in concluding otherwise. After reciting the *Hartz* "overreaching in the atmosphere and environment of a confidential relationship" test, the intermediate appellate court disagreed with Mrs. Herget and explained that the trial court had concluded correctly that the agreement was fair and equitable. It determined there was substantial evidence that Mrs. Herget had " 'entered [the agreement] voluntarily, freely and with full knowledge of its meaning and effect' as required by *Hartz*." *Id.* at 277, 550 A.2d at 386. Mrs. Herget understood the full meaning and effect of a waiver of alimony because she had executed, and abided by, a similar waiver in a 1970 separation agreement from her first husband. She also evinced an understanding of other portions of the agreement at hand when she apportioned the proceeds of the sale of the marital home in accordance with their respective cash contributions as

---

15. Prior to receiving the draft copy, the parties met with Mr. Herget's lawyer and disclosed their respective financial information to him. Mr. Herget listed his assets and net worth at $1,604,000. Mrs. Herget listed her assets and net worth at $690,000 and a note anticipating the payment of $80,000 from her grandmother's will. *Herget,* 77 Md.App. at 273, 550 A.2d at 384. Although Mr. Herget inadvertently had not listed a pension interest worth $71,700, the intermediate appellate court held that the trial court's conclusion that Mr. Herget's disclosure was "frank, full and truthful" was not "clearly erroneous." *Id.* at 275, 550 A.2d at 385.

stated in the antenuptial agreement. Lastly, although she was only a high school graduate, Mrs. Herget was found by both courts to be an intelligent, sophisticated person on par with Mr. Herget, who held a bachelor's degree and was a successful businessman. *Id.* at 278, 550 A.2d at 386. The Court of Special Appeals did not mention in its analysis any confidential relationship that may have existed between the parties.

In *Harbom v. Harbom,* Judge Arrie Davis of the Court of Special Appeals again affirmed a trial court's finding of the validity of an antenuptial agreement. 134 Md.App. 430, 438, 760 A.2d 272, 276 (2000). Mr. Harbom's father founded a plastics company, acquired investment accounts and real property, and was the holder of several loans. In 1962, the father gave these assets to Mr. Harbom, subject to the condition that they remain solely his separate property if he ever married. On 31 March 1986, Mr. Harbom and his soon-to-be wife entered into an antenuptial agreement negotiated by their respective parents. The agreement provided that both parties waived any right to the other's premarital property or any proceeds traceable to their respective premarital property. *Id.* Mrs. Harbom's father, a "Harvard-trained tax attorney," negotiated the terms of the antenuptial agreement as early as 3 January 1986, as evidenced by a letter sent by Mr. Harbom's father that acknowledged that the proposed antenuptial agreement would not waive Mrs. Harbom's right to the marital home and retitle Mr. Harbom's premarital home in both of their names as tenants by the entirety. *Id.* at 447, 448, 760 A.2d at 280, 281. The agreement did not disclose expressly the value of the listed assets. *Id.* at 449, 760 A.2d at 282.

Mrs. Harbom challenged the validity of the agreement, claiming that a full disclosure did not occur because Mr. Harbom had not disclosed the assets' values. The Court of Special Appeals explained that the "disclosure need not be a drastically sweeping one and the wife need not know the husband's exact means so long as she has a general idea of his

property and resources." [16] *Id.* at 449, 760 A.2d at 282 (citing Lindey, *Separation Agreements and Antenuptial Contract,* § 90–44). Even without a full, frank, and truthful disclosure, the enforcing party yet may satisfy his or her burden to show that the antenuptial agreement meets the overarching "over-reaching standard."

The intermediate appellate court determined that the parents' discussions and negotiations about the assets referred to in the antenuptial agreement "amply" supported the trial court's conclusion that Mrs. Harbom had "actual knowledge of every fact regarding [Mr. Harbom's] assets and income that she was interested in or sought to discover" and that she was relinquishing any claim to these assets. *Id.* at 449, 760 A.2d at 282. Furthermore, even if Mr. Harbom's disclosure was not full and Mrs. Harbom's knowledge insufficient to be considered actual knowledge of the value of the assets, Mr. Harbom met his burden to prove that the agreement was not an overreaching one and that Mrs. Harbom entered the agreement "voluntarily, freely and with full knowledge of its meaning and effect and that there was no overreaching." *Id.* at 450, 760 A.2d at 282. The Court of Special Appeals held correctly that she was "given every opportunity" to negotiate, or draft a different proposed antenuptial agreement if the agreement was not acceptable to her. *Id.* at 450, 760 A.2d at 282–83.

---

**16.** The trial court noted that Mrs. Harbom's father had "negotiated the agreement on his daughter's behalf and that [Mrs. Harbom] 'had reasonably good understanding of what she was giving up,' "and that Mrs. Harbom " 'knew that [Mr. Harbom's company] was worth a lot of money, and she gave it up.' " *Id.* at 449, 760 A.2d at 282. This finding appears, at first blush, to run counter to our requirement that a full, frank, and truthful disclosure occur at the time the agreement is signed. A more careful reading of *Hartz,* however, reveals that such a level of disclosure merely assists the enforcing party in meeting its burden of proving that an overreaching did not occur.

## C.

### In Summation

In *Levy v. Sherman,* the Court of Appeals departed from a straight forward contract analysis of antenuptial agreements that had been utilized by the Court from the previous century. The Court chose to focus on the alleged existence of a confidential relationship, which, if one existed, would place the burden of proof on "those claiming under it when the instrument is attacked" to show that the contract was fair and reasonable. After reviewing cases from other jurisdictions, available secondary sources, and Maryland's 19th century cases on the matter, *Levy* stated that it was impossible to reconcile the diverging authorities as to how to determine whether an alleged confidential relationship existed prior to the execution of an antenuptial agreement. Instead, *Levy* stated that:

1) A confidential relationship existed between both parties;

2) Each party was required to make a frank, full, and truthful disclosure of their respective worth in real and personal property;

3) In those cases where the appropriate disclosure was not made and the allowance in the agreement was unfairly disproportionate to the "worth," fraud was "implied"; and

4) The burden of proof was placed on the enforcing party to show:

A) The agreement was freely, voluntarily, and knowingly entered, and

B) Each party was given the opportunity to seek legal advice.

In 1955 (ten years after *Levy*), *Ortel v. Gettig* extended the breath of the confidential relationship analysis. The trustee of Mr. Gettig's estate argued that the marriage between the 62 year old husband and the 42 year old wife was one of convenience, where the parties would not be "clouded by the ardor of youth". *Ortel* held that it was of no moment if the party seeking to enforce the agreement and his spouse were

married for convenience; the confidential relationship existed nonetheless as postulated in *Levy* (the age gap between Levy and his spouse were roughly similar). *Ortel* reiterated the *Levy* analysis, and held the particular antenuptial agreement invalid in that case because the disclosure was not full and frank with regard to the husband's worth.

*Hartz*, in 1967 and for the first time, analyzed an antenuptial agreement as a question of overreaching, rather than disclosure. We stated there that the "real test in a determination of the validity of an antenuptial agreement is whether there was overreaching, that is, whether in the atmosphere and environment of the confidential relationship there was unfairness or inequity in the result of the agreement or in its procurement."

*Hartz*, after reciting the language from *Levy* as to disclosure, added that the purpose for the "frank, full, and truthful" disclosure was to disclose to the attacking party the property subject to waiver so that "he or she who waives can know what it is he or she is waiving." *Hartz* extended *Levy* and explained that if the attacking party had "adequate knowledge" of what such a disclosure would reveal, then a formal disclosure was not required. *Hartz* nonetheless encouraged that "careful" practitioners should still make the frank, full, and truthful written disclosure because such a disclosure would "turn the lock of the door to impregnable validity."

*Hartz* did not exercise this metaphor because the Court agreed with the trial court that there was neither adequate disclosure nor actual knowledge on its record. Instead, *Hartz* applied the overreaching analysis to allow for valid agreements even where no disclosure was made, "[the] failure to disclose or lack of precise knowledge will not necessarily be fatal to the validity of the antenuptial agreement." *Hartz* also described "alternate standards" by which the validity of the agreement could be proven:

1) Is the benefit to the waiving party commensurate with what he or she relinquished such that the agreement was fair and equitable?

2) Did the party attacking the agreement enter the agreement freely and understandingly?

An affirmative showing on these questions could demonstrate that the attacking party was not prejudiced by the lack of information and that the attacking party could not repudiate the agreement.

*Frey,* in 1984, broadened the *Hartz* "overreaching" analysis further by extending it to antenuptial agreements made in anticipation of divorce. Prior to *Frey,* antenuptial agreements conditioned on divorce (or dealing with alimony, etc.) were void as against the public policy of Maryland to protect the institution of marriage. *Frey* reiterated favorably, without applying, the *Hartz* analysis and opined that the real test of an antenuptial agreement was one of "overreaching".

## II.

Mrs. Cannon asserts here that the Circuit Court and the Court of Special Appeals erred in not recognizing fully the confidential relationship that existed as a matter of law between the parties. Had the courts recognized the relationship, they should have required Mr. Cannon to have made a full, frank, and truthful disclosure of his assets, which he failed to do. If the existence of a confidential relationship is no longer established as a matter of law in such situations, she urges that any new standard should not be applied retrospectively and the case should be remanded to the trial court to determine whether a confidential relationship existed as a matter of fact based on the evidence of record.

Mr. Cannon retorts that the question of whether a confidential relationship existed is moot as to the question of the validity of the antenuptial agreement in this case. In the alternative, he argues that the Court of Special Appeals, after paying homage to the adoption in 1972 of Article 46 of the Maryland Declaration of Rights (the Equal Rights Amendment),[17] correctly held that the existence of a confidential

---

17. Article 46 of the Maryland Declaration of Rights states, "[e]quality of rights under the law shall not be abridged or denied because of sex."

relationship between parties to an antenuptial agreement is a question of fact in each case, not a relationship presumed as a matter of law to exist in each case. He believes (correctly) that the ERA precludes any determination of legal status based on gender. As a result, he claims that the underpinning has changed for the recognition as a matter of law of confidential relationships in antenuptial agreement situations. Because confidential relationships in general contract law are established when one party is dominant over the other and, he asserts, a presumption based on gender existed at common law that the male was dominant to the female in the marriage relationship, a confidential relationship no longer may be assumed to exist as a matter of law. As a result, Mrs. Cannon did not adduce by sufficient evidence that a confidential relationship existed in this case and, therefore, the burden of proof properly fell upon her to establish the invalidity of the antenuptial agreement.[18]

▬▬ We maintain our view that a confidential relationship exists, as a matter of law, between the parties entering an antenuptial agreement. Mr. Cannon, and the Court of Special Appeals's cases that he cites, are incorrect to rely on the adoption of the Maryland ERA to denigrate the existence of a confidential relationship as a matter of law in such contexts. There is no ambiguity in *Levy* or *Hartz* concerning the confidential relationship that exists in antenuptial agreements—the parties stand in a confidential relationship with each other in such situations. The pre-marital relationship by

---

**18.** Mr. Cannon also encourages us to adopt the Uniform Premarital Agreement Act (UPAA) as the correct analytical standard by which to evaluate challenges to the validity of antenuptial agreements. The UPAA does not provide a role for a confidential relationship in its analytical paradigm, but requires the attacking party to bear the burden of proof and appears to limit the doctrine of unconscionability. While Mr. Cannon lists several jurisdictions that, in his opinion, have adopted successfully the UPAA, we remain reluctant to change our common law standard and align Maryland with the UPAA approach. Adopting a uniform act, and the consequential change in Maryland Family Law, is best left for fuller consideration, in the first instance, to the General Assembly, where it can be more thoroughly debated and evaluated than the parties have in the present case.

itself is of no consequence; however, when parties in a pre-marital relationship enter an antenuptial agreement where the consideration for the agreement is the impending marriage, a confidential relationship necessarily arises. There is no gender consideration involved, and thus the ERA is of no moment in the analysis because the parties are required to make mutual disclosures prior to entering the antenuptial agreement. *Hartz*, 248 Md. at 56–57, 234 A.2d at 870–71 ("this confidential relationship calls for frank, full and truthful disclosure of the worth of the property, real and personal, as to which there is a waiver of rights in whole or part, so that he or she who waives can know what it is he or she is waiving.")

The Court of Special Appeals's and Mr. Cannon's reliance on the ERA is a misguided application of reasoning more suited to post-marital agreements, where the presumption of a confidential relationship at common law was based on recognizing male dominance in the marriage relationship. Inappositely, the common law development of antenuptial agreements explains that a confidential relationship is imposed so that each party bears the duty to make a frank, full, and truthful financial disclosure. *Compare Manos v. Papachrist*, 199 Md. 257, 261–62, 86 A.2d 474, 476 (1952) *with Levy*, 185 Md. at 73, 43 A.2d at 29. In *Manos*, we explained that a confidential relationship between spouses in a post-marital agreement presumed that the male was the dominant party; yet, ultimately the existence of the relationship was a question of fact. Twenty-five years later and after the passage of the ERA, the Court of Special Appeals noted that this presumption of male dominance in post-marital agreement analysis was an invalid classification based on gender. *Bell v. Bell*, 38 Md.App. 10, 14, 379 A.2d 419, 421 (1977). While the gender-based classification basis for recognition of confidential relationships in the context of post-marital agreements was invalidated by the ERA, we already noted, *supra*, that an antenuptial agreement is a species of contract of another sort than its distant cousin, the post-marital agreement. The intermediate appellate court's reliance in the present case on the analysis of confidential relationships in post-marital agreements is incorrect. *See*

*Tedesco v. Tedesco,* 111 Md.App. 648, 683 A.2d 1133 (1996); [19] *Hale v. Hale,* 74 Md.App. 555, 539 A.2d 247 (1988); *Blum v. Blum,* 59 Md.App. 584, 477 A.2d 289 (1984); *McClellan v. McClellan,* 52 Md.App. 525, 451 A.2d 334 (1982).

 Even though a confidential relationship is presumed to exist as a matter of law, its existence may be rebutted in a given case by the party seeking enforcement of the agreement. If the party seeking enforcement can prove that a negotiation took place between the parties—an actual give and take occurrence, then a court properly may treat the contested agreement as a contract between equals. *See Harbom,* 134 Md.App. at 448, 760 A.2d at 281 (observing that Mrs. Harbom's father negotiated the antenuptial agreement "in his daughter's best interest ..." by insisting to Mr. Harbom's father that Mr. Harbom retitle his pre-marital home as tenants by the entirety). Merely proving that the attacking party drafted the agreement would not be enough, without evidence of some negotiation; evidence as to who drafted the

**19.** The Court of Special Appeals here incorrectly relied on *Tedesco* to explain away our decisions regarding the existence of confidential relationships in antenuptial agreements that arose prior to the passage of the ERA.

When the voters of Maryland ratified what is now Article 46 of the Declaration of Rights ... *[t]he presumption of dominance in a marriage by a husband was erased* ... Accordingly, in our assessment of the issues presented, the existence of a confidential relationship and the imposition of a constructive trust based upon a finding of a confidential relationship, we must focus on either *wife/husband* cases subsequent to the passage of the Equal Rights Amendment or cases prior to the Equal Rights Amendment not involving *wife/husband* transfers, i.e., relationships in which no presumptions were present. *Cannon v. Cannon,* 156 Md.App. 387, 413–14, 846 A.2d 1127, 1142 (2004) (first emphasis in original, subsequent emphasis added) (quoting *Tedesco v. Tedesco,* 111 Md.App. 648, 667–68, 683 A.2d 1133, 1143 (1996) (citations omitted)). While the ERA clearly demands a closer inspection of gender-based classifications in analyzing pre-separation agreements in husband/wife relationships because of the historical bias of male dominance, *see Manos,* 199 Md. at 261–62, 86 A.2d at 476, the temporal focus of the analysis of antenuptial agreements is at the time the agreement is signed, before the husband/wife relationship comes into being. At the time the antenuptial agreement is entered, the parties have a confidential relationship to each other to make the requisite disclosure. This requirement is inherently gender neutral.

agreement is considered more properly in analysis of an argument under the overreaching standard. *See Hartz,* 248 Md. at 60, 234 A.2d at 873 (observing that the husband required a mutual waiver of marital rights and ultimately holding that the agreement was valid).

With the existence of a confidential relationship between the parties, the burden of proof correctly falls upon the party seeking to enforce the agreement. The correct standard for determining the validity of an antenuptial agreement remains, however, whether there is an "overreaching, that is, whether in the atmosphere and environment of the confidential relationship there was unfairness or inequity in the result of the agreement or procurement." *Hartz,* 248 Md. at 57, 234 A.2d at 871.

One way (and perhaps the gold standard) a party seeking to enforce an agreement may meet its burden, justifying the validity of the antenuptial agreement, is if it documents a full, frank, and truthful disclosure of his or her assets and their worth before the antenuptial agreement is signed.[20] Thus, the circumspect legal practitioner (or unrepresented party) will memorialize in writing such a disclosure in order to minimize litigation of challenges to the validity of an antenuptial agreement. Likewise, if the enforcing party is able to show that the party attacking the agreement possessed knowledge of the assets subject to the agreement's waiver provisions, then the agreement also may be found to be valid.[21]

---

**20.** A full, frank, and truthful disclosure means, at one extreme, listing every asset and a reasonable value if one seeks to utilize the "key that turns the lock of the door leading to impregnable validity." *Hartz,* 248 Md. at 57, 234 A.2d at 871 (footnote omitted). Mrs. Cannon alleges that the Court of Special Appeals misinterpreted the disclosure requirement by accepting a more general level of disclosure and not a full, frank, and truthful disclosure. *See Cannon,* 156 Md.App. at 410, 846 A.2d at 1140. As we shall explain, *infra,* a general disclosure, although insufficient to render the Agreement "impregnable," may contribute towards showing that an overreaching did not occur.

**21.** Proof of knowledge, unlike full, frank, and truthful disclosure, does not require that the enforcing party demonstrate that the attacking

The purpose behind a requirement of disclosure or knowledge is "so that he or she who waives can know what it is he or she is waiving." *Id.* at 56–57, 234 A.2d at 870–71. If this is proven by the enforcing party and insufficiently rebutted by the attacking party, there can be no overreaching and the attacking party must resort to other common law contract defenses to attack the validity of the antenuptial agreement.

■■■ A party seeking to enforce an antenuptial agreement, if he or she fails either to make the required disclosure or is unable to prove knowledge by the attacking party yet may prove that the agreement was not unfairly disproportionate to the attacking party at the time the agreement was entered. For example, an antenuptial agreement that provides valuable consideration (other than marriage itself) in exchange for a waiver, or where the parties agree to a mutual waiver of the marital rights, is more likely not to be found unfairly disproportionate.

■■■ If the analysis of the allowance versus waiver provisions of an agreement results in a determination that the terms are unfairly disproportionate as to the party challenging the agreement, the enforcing party must show that over-reaching did not occur. On this point, but not meant as an exhaustive list of factors, the trial court may consider such factors as the extent of the disclosure (if any), whether the attacking party had the opportunity to seek legal advice before signing the agreement, and whether the attacking party voluntarily and knowingly relinquished his or her rights. Furthermore, a failure to disclose or a lack of precise knowledge by the attacking party, by itself, may not be enough to establish as invalid an antenuptial agreement.

---

party had knowledge of the discrete value of each asset. Instead, knowledge means that the attacking party must be shown to have adequate knowledge—knowledge of the existence of the assets subject to the waiver and knowledge of what those assets are worth in sum so that the attacking party may be found to know what it is he or she is waiving.

A party seeking to attack the agreement may resort to the other potential contract defenses enumerated earlier—fraud, duress, coercion, mistake, undue influence, or incompetence on the part of a party. While most of these defenses to contract enforcement likely will be considered to some degree in the analysis of an argument regarding overreaching, the doctrine of unconscionability remains a viable alternative, if the unconscionable condition can be proven to have existed at the time the agreement was entered. *See Martin v. Farber,* 68 Md.App. at 144–45, 510 A.2d at 611 (holding agreement valid after determining trial court incorrectly applied doctrine of unconscionability).

## III.

We turn now to the question of whether the Court of Special Appeals erred in finding the Agreement valid in the present case. The trial court held that the Agreement would have been valid were it to terminate with the end of the alleged bankruptcy threat in 1996; however, because Mr. Cannon allegedly sought to extend the duration of the Agreement beyond that point, counter to Mrs. Cannon's expectations, it was invalid. Mrs. Cannon argues that the Court of Special Appeals abused its authority in overturning the trial court's decision because that judgment was not clearly erroneous. *See* Md. Rule 8–131(c). She also argues that the Agreement here is similar to the post-marital agreement in *Williams v. Williams,* 306 Md. 332, 342, 508 A.2d 985, 990 (1986), where we reversed the judgment of the Court of Special Appeals, holding that agreement invalid for unconscionability. Lastly, if the Court of Special Appeals had applied the *Hartz* factors as Mrs. Cannon wishes and properly considered the existence of a confidential relationship, she postulates that it could not have found the Agreement valid.

Mr. Cannon ripostes that his antecedent disclosure of his assets, combined with Mrs. Cannon's knowledge of the effect of the antenuptial agreement, renders the Agreement "impregnable." He also believes that the existence of a confidential relationship is a moot point in resolving the alleged

invalidity of this Agreement. Even if an express factual finding as to the existence of a confidential relationship is required and the burden of proof placed on him to establish the validity of the Agreement, the record clearly supports, in Mr. Cannon's view, both an adequate disclosure of assets and consideration of the *Hartz* factors in his favor. Lastly, he contends that the trial court incorrectly considered parole evidence in holding the Agreement invalid.

## A.

Mr. Cannon is wrong in his assertion that his antecedent disclosure made the Agreement "impregnable." There is no way to make an antenuptial agreement or any other contract "impregnable." To best protect against an attack based on overreaching, the enforcing party must disclose both the assets and their value to the party attacking the agreement. The disclosure here, which merely listed assets, was insufficient to meet that high standard.

Mr. Cannon argues that the burden of proof fixed on him by the confidential relationship should not change the result of the Court of Special Appeals's decision. The circumstances surrounding the Agreement must be examined to decide "whether there was overreaching, that is, whether in the atmosphere and environment of the confidential relationship there was unfairness or inequity in the result of the agreement or in its procurement." *Hartz,* 248 Md. at 57, 234 A.2d at 871. We remain mindful that the basic issue is one of overreaching, not the mere absence of full disclosure, and examine the disclosure for prejudice to the attacking party, Mrs. Cannon in this case. *Id.* at 58, 234 A.2d at 872 (quoting Lindey, *Separation Agreements & Ante-nuptial Contracts,* § 90–44). The Agreement here is valid if it was fair and equitable in light of the rights waived and if the contract was entered "freely and understandingly." *Id.* at 58, 234 A.2d at 871–72.

As discussed *supra,* Mr. Cannon's disclosure was less than the full, frank, and truthful disclosure required for "impregna-

bility." The trial court found that "there was some disclosure" and that Mrs. Cannon had "some knowledge" of Mr. Cannon's assets and income at the time the Agreement was entered. In addition, the Court of Special Appeals correctly recognized that Mrs. Cannon's co-habitation with Mr. Cannon for four years prior to the marriage gave her ample opportunity to attain at least a general idea of Mr. Cannon's worth. *Cannon,* 156 Md.App. at 409–10, 846 A.2d at 1140. She knew of his full time job (and overtime) and his ability to finance the purchase of the New Market Home only after he applied the proceeds from the sale of his townhouse to the purchase.

At the same time, Mr. Cannon had a comparable level of knowledge of Mrs. Cannon's assets. The same disclosure that listed Mr. Cannon's assets, without values, also listed Mrs. Cannon's assets, also without values. Mr. Cannon was credited by the trial court with a general knowledge of Mrs. Cannon's income and assets. As a result, we agree with the Court of Special Appeals and conclude that the amount of disclosure and the knowledge each of the Cannons had regarding the other's assets and income favors the validity of the Agreement.

We also examine whether Mr. Cannon established that Mrs. Cannon had knowledge of the effect of the Agreement and entered into it voluntarily. To resolve this, we also consider the role of seeking independent counsel in assessing challenges to the validity of antenuptial agreements. The trial court offered the following, "[o]ne can't just remain ignorant, hide their eyes, and say, gee, I didn't know what this was all about so it's got to be undone. One has some obligation to exercise some independent learning as to what's going on. I don't think anything prevented Mrs. Cannon from having an understanding." Mr. Cannon presented evidence that Mrs. Cannon possessed knowledge of at least some of the terms of the Agreement and the Agreement itself recited that both parties had full knowledge and effect of the waivers. Mr. Cannon also produced a notary who testified that Mrs. Cannon entered her bank office alone and asked that her signature on the Agreement be notarized. Although it was disputed when

Mrs. Cannon received the Agreement, the trial court discredited her claim that she signed the Agreement at home after only a short discussion with Mr. Cannon. The trial court further gave credit to Mr. Cannon's evidence that "[Mr. Cannon] didn't really bother her every day about it. He asked a couple of times." Mrs. Cannon appeared to have at least several days to examine the Agreement and Mr. Cannon inquired at least a couple of times about her concerns regarding the Agreement while the two co-habitated in the New Market home.

In this case, Mrs. Cannon did not avail herself of the opportunity to seek legal counsel. We are loathe to craft a brightline rule where both sides are compelled to seek counsel prior to entering into an antenuptial agreement. It was enough for Mr. Cannon to demonstrate that Mrs. Cannon had the opportunity to seek counsel and that she was not discouraged to do so.[22] *See Levy*, 185 Md. at 73–74, 43 A.2d at 29. Mrs. Cannon had some appreciation of the importance of legal counsel in similar situations because she had been represented by counsel during her prior divorce and separation agreement negotiation, as well as her bankruptcy proceedings. Both parties agreed, at the least, that Mr. Cannon did not discourage Mrs. Cannon from seeking legal advice prior to executing the Agreement. Furthermore, because she had several days to review the Agreement before she signed it, Mrs. Cannon had the opportunity and apparently chose not to seek independent legal advice. These considerations militate in favor of the validity of the agreement.

### B.

Mrs. Cannon asserts that application of the *Hartz* factors compel a different conclusion than reached by the intermediate appellate court. We find her argument uncompelling.

---

**22.** Mrs. Cannon failed to meet her burden of production to rebut this fact when she admitted that she was not discouraged from seeking counsel during the seventeen days between when she was handed the Agreement and when she executed it on 27 May.

Mrs. Cannon appears to rely on a list of factors she marshaled at trial to assist the court in determining the validity of the Agreement. The Fader/Gilbert treatise she relies upon lists as "important considerations" the summary of *Hartz* that we reiterated as dicta in *Frey*. She relies on the trial court's finding that a confidential relationship occurred. As we explained earlier, *Hartz* detailed a multi-step analysis to determine the validity of an antenuptial agreement under an "overreaching" standard. At the outset, the parties stand in a confidential relationship with each other and are expected to make a full, frank, and truthful disclosure of the identity and worth of assets that are subject to eventual waiver by each in the agreement. This relationship compels both parties to make comparable levels of disclosures at or before the time the agreement is executed. When the validity of the agreement is contested, the confidential relationship at the time of the execution of the agreement means that the enforcing party must shoulder the burden of proof as to the validity of the Agreement.

Here, the Court of Special Appeals correctly analyzed the trial court's attempt to scrutinize the Agreement and determined rightfully that the analysis mandated by *Hartz* favored a finding of validity. Even with the burden of proof allocated to Mr. Cannon, the evidence he adduced, which the trial court credited, showed that Mrs. Cannon had ample opportunity to review the Agreement and seek counsel before she signed it. After co-habitating with Mr. Cannon for four years before the marriage, she had a degree of knowledge of Mr. Cannon's assets. Based on her experience with her first divorce, she knew the legal significance of her waivers in the Agreement. There was no evidence suggesting that she did not sign the Agreement voluntarily; in fact, Mrs. Cannon admitted that Mr. Cannon's questions about whether she signed the Agreement prior to 27 May did not rise to a level of a continuous barrage—a far cry from duress.

Mrs. Cannon maintains that the Agreement in this case is not too far afield from the post-marital agreement in *Williams*, declaring that the factual similarities are "striking."

Inexplicably, she relies on a post-marital agreement case while strenuously arguing, *supra,* that such cases are inapplicable to antenuptial agreements. In any case, *Williams* is inapposite in its result because the trial court there found the separation agreement invalid as unconscionable. In *Williams,* the husband entered into the post-marital agreement in an attempt to reconcile marital difficulties with his less-than-faithful wife. 306 Md. at 333–34, 508 A.2d at 986. As a result, he transferred title to most of the marital property to his wife's name solely while remaining responsible for the marital financial obligations. *Id.* The trial court held, and we agreed, that while the contract was validly entered, the result was unconscionable and refused to enforce the agreement. *Id.* at 342–43, 508 A.2d at 990–91. In the present case the trial court did not rely on unconscionability to defeat the Agreement. Although one term of the Agreement was described as draconian,[23] we agree with the intermediate appellate court that such does not sink to the level of unconscionability. *Cannon,* 156 Md.App. at 417–20, 846 A.2d at 1144–46. Even under *Williams,* a basic aspect of unconscionability is that it must "shock the conscience" of the court when it considers the terms and results at the time the contract is entered. 306 Md. at 335–38, 508 A.2d at 987. Furthermore, the total Agreement here hardly could be said to shock the conscience of the trial court because it deemed the Agreement at least valid to some extent (until 1996 or the alleged end of the bankruptcy threat).

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.*

---

**23.** The trial court observed that the clause granting Mr. Cannon the right to eject Mrs. Cannon from the New Market home upon sixty days notice "was as gently written a provision as it could be given it's one day one could wake up and be told you're out of here. I'll be back in 60 days. So I find that, that frankly even at the time of signing this was a pretty draconian set of terms."